LEO TABORN v. CLEVELAND HAMMONDS AS SUPERINTENDENT OF THE DURHAM CITY SCHOOLS AND DURHAM CITY BOARD OF EDUCATION

No. 8614SC328

(Filed 16 December 1986)

1. Schools § 13.2— teacher dismissal—reduction in force—following of board's policy and state law—insufficient findings

Findings by a city board of education were insufficient to support its conclusion that the board's reduction in force policy and state law were followed in the mid-year dismissal of plaintiff as a probationary teacher of emotionally handicapped students because of a decrease in funding for the Exceptional Children Program.

2. Schools § 13.2— teacher dismissal—previous vote to dismiss plaintiff—fair hearing

Plaintiff teacher was not denied a fair hearing before a city board of education in a dismissal proceeding because the board had previously voted to terminate him where the board rescinded that decision and afforded plaintiff an opportunity to be heard.

3. Schools § 13.2— teacher dismissal—departure of board member during hearing—no violation of due process

Plaintiff teacher was not denied due process in a dismissal proceeding because a member of the board of education departed during the hearing and was absent during the board's deliberation.

APPEAL by plaintiff from *Ellis, Judge.* Judgment entered 12 November 1985 in Superior Court, DURHAM County. Heard in the Court of Appeals 28 August 1986.

This is an appeal from an administrative decision by the Durham City Board of Education to discharge plaintiff, Leo Taborn, during the middle of a school year. The defendants in this action are the Superintendent of the Durham City Schools, Dr. Cleveland Hammonds (hereinafter the Superintendent), and the Durham City Board of Education (hereinafter the Board).

Plaintiff is certified to teach emotionally handicapped students. On 16 August 1984, plaintiff entered into a contract for professional service with the Board. The Superintendent assigned plaintiff to teach a class of emotionally handicapped students in a self-contained classroom. at E. K. Powe Elementary School. In a letter from an assistant superintendent dated 11 December 1984, plaintiff was notified that due to a recent analysis of the Exceptional Children Program, the Board, on 10 December 1984, had approved the termination of his teaching position at the close of the school day on 18 January 1985. By letter dated 7 January 1985, plaintiff notified the Board of his opinion that his discharge was wrongful and requested a hearing on the matter. Thereafter, on advice of counsel, the Superintendent recommended to the Board that plaintiff's termination be rescinded. The Board voted to rescind the termination of plaintiff. In a letter dated 10 January 1985, the Superintendent informed plaintiff that due to a decrease in funding resulting from a teacher audit by the North Carolina Department of Instruction, it was his decision to recommend to the Board that plaintiff be dismissed from his teaching position. The Superintendent's letter also informed plaintiff that he could make a request within fifteen days of receipt of the letter for a hearing on the Superintendent's recommendation and that thereafter the Board would review the recommendation for his termination. Plaintiff timely requested a hearing.

On 30 January 1985, a hearing was held by the Board to review the Superintendent's recommendations that plaintiff and two other teachers be discharged. Five board members attended the hearing, but board member Ms. Copeland, for unexplained reasons, departed during the proceedings.

The Superintendent primarily presented documentary and testimonial evidence that chronicled the reduction of funds allotted by the state and the subsequent reduction in force. At the hearing it was established that an audit by the Division of Teacher Allotments/Student Accounting for the State Board of Education revealed that, *inter alia,* the Durham City School System had duplicated headcounts of students in the Exceptional Children Program. The auditor testified that the "Duke Hospital Program" ("Duke Hospital Program is under the fiscal control of the Durham City Schools") reported all students in the average daily membership in the Exceptional Children Program 1 June 1984 headcount; that there are ten categories in the Exceptional Children Program; that a headcount is submitted to the State Board for each category; that the Durham City School System correctly reported sixty-two (62) students in the emotionally handicapped category; and that the state's audit figure also showed sixty-two (62) students. The auditor testified further that the count of sixty-two (62) emotionally handicapped students served as a basis for funding allotments for the 1984-1985 school year. The audited figure for the category of learning disabilities was thirty (30) less than the figure reported by the Durham City Schools. It was further established at the hearing that as a result of duplication of headcounts in the Exceptional Children Program and the declassification of children reported by the "Duke Hospital Program," the audit report recommended that: "This office require the Durham City Schools to refund funds for the 285 handicapped students reported in excess for which they are entitled."

On 31 August 1984, the Superintendent was officially informed by letter that his school system would have $211,150.72 cut from state allocations and $58,560.00 cut from federal funds. The Superintendent requested that budget cuts be spread over a two year period, but declined to go publicly before the State Board of Education on the issue of duplication of headcounts and the reported procedural irregularities with the "Duke Hospital Program." Thereafter, at the direction of the Superintendent, a committee of three people was instructed to formulate a list of teachers to be recommended for discharge. The committee included plaintiff's name in the list of five teachers to be recommended for discharge. Plaintiff testified that the mid-year replacement of

him by another teacher would be detrimental to the class of emotionally handicapped students and that they would suffer a loss of one year in progress.

In a decision dated 4 February 1985, the Board terminated plaintiff's employment. Plaintiff appealed to Superior Court. A hearing was held at the 15 August 1985 session of Superior Court in Durham County to review the Board's decision. On 12 November 1985, the court affirmed the Board's decision. Plaintiff appeals.

*Glenn and Bentley, P.A., by Stewart W. Fisher, for plaintiff appellant.*

*Spears, Barnes, Baker, Hoof & Waino, by Marshall T. Spears, Jr. and Gary M. Whaley, for defendant appellees.*

JOHNSON, Judge.

[1]  Plaintiff's first argument is that there is not substantial evidence to support the Board's finding that he was discharged in accordance with the Board's reduction in force policy. The General Assembly has statutorily prescribed our scope of review as follows:

> Sec. 150A-51 Scope of review; power of court in disposing of case.
>
> The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the agency findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-30 in view of the entire record as submitted; or

(6) Arbitrary or capricious.

G.S. 150A-51. The standard of review stated in subsection (5) is known as the "whole record" test. *See generally Thompson v. Wake County Board of Education,* 292 N.C. 406, 233 S.E. 2d 538 (1977). The Court in *Thompson, supra,* explained the "whole record" test as follows:

> The 'whole record' test does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo, Universal Camera Corp., supra.* On the other hand, the 'whole record' rule requires the court, in determing the substantiality of evidence supporting the Board's decision, to take into account whatever in the record fairly detracts from the weight of the Board's evidence. Under the whole evidence rule, the court may not consider the evidence which in and of itself justifies the Board's result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.

*Thompson, supra,* at 410, 233 S.E. 2d at 541.

In *Abell v. Nash County Board of Education,* 71 N.C. App. 48, 321 S.E. 2d 502 (1984), *disc. rev. denied,* 313 N.C. 506, 329 S.E. 2d 389 (1985), this Court reversed a summary judgment that a trial court entered for Nash County Board of Education. The decision in *Abell, supra,* was based on the fact that no rational reason appeared conclusively for a decision not to renew the contracts of two probationary teachers. This Court in *Abell, supra,* specifically clarified the decision in *Hasty v. Bellamy,* 44 N.C. App. 15, 260 S.E. 2d 135 (1979), and followed the "general rule that 'arbitrary' or 'capricious' reasons are those without any rational basis in the record, such that a decision made thereon amounts to an abuse of discretion." *Abell, supra,* at 52-53, 321 S.E. 2d at 506. It is significant to note that the decision to not renew the contract of a probationary teacher invokes less statutory procedural protections than a decision to recommend that a probationary teacher be discharged at mid-year when there appears to be a lack of funding. *See* G.S. 115C-325(m)(1). *See also,* G.S. 115C-325(e). A probationary teacher may not be dismissed at mid-year except for reasons that a career teacher may be dismissed such as lack of funding, *see*

G.S. 115C-325(e)(1)1, and may only be dismissed according to the procedures applicable to mid-year or discharge of a career teacher, *see* G.S. 115C-325(m)(1). Thus, the statutory protections are greater for probationary teachers sought to be discharged at mid-year. In *Abell, supra,* this Court decided that in the case of a non-renewal, it is not required that a Board of Education make exhaustive inquiries or formal findings. *Abell, supra,* at 53, 321 S.E. 2d 507. However, relying upon the landmark case of *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 28 L.Ed. 2d 136, 91 S.Ct. 814 (1971), this Court ruled that a reviewing court must be able to determine what factors were used to reach an administrative decision as well as whether said decision was arbitrary, capricious, an abuse of discretion, or not in accordance with law. *Abell, supra,* at 53, 321 S.E. 2d at 507. We have surmised that the General Assembly has expressly intended to provide teachers in programs of special education and related services protection from a reduction in funding. *See generally* G.S. 115C-142. This Court has construed the purpose of G.S. 115C-142 as follows:

> The manifest purpose of G.S. 115[C]-142 was to provide teachers of proven ability for the children of this state by protecting such teachers from dismissal for political, personal, arbitrary or discriminatory reasons.

*Taylor v. Crisp,* 286 N.C. 488, 496, 212 S.E. 2d 381, 386 (1975).

In the case *sub judice,* the Board of Education with respect to the termination of plaintiff, found the following, to which plaintiff excepts:

> 5. That because of the aforementioned loss of funds, the Exceptional Children Program, which had been staffed in reliance upon the initial proposed allotments, did not have sufficient funds for personnel expenses to pay all the professional and para-professional persons who had originally been assigned to said Program for the 1984-85 school year.

> 6. That at the request of the superintendent and in accordance with Board policy, the Director of Exceptional Children reviewed the qualifications, certification, evaluations and experience of all of the professional staff in those areas of the Exceptional Children Program in which professional staff re-

ductions were necessary to begin to bring personnel in line with the annualized funding available for said Program.

7. That the respondents were properly included within that group of professional staff which were designated by the administration for termination of employment as part of the Exceptional Children Program due to a reduction in force because of the decrease in funding.

(Exceptions omitted).

Our primary task is to apply the "whole record" test and determine if the foregoing findings support the following conclusion made by the Board:

3. That Board policy and state law were followed in making the selection of which members of the professional staff were to be recommended for dismissal.

The Board's policy regarding reduction in instructional personnel is as follows:

POLICY REGARDING REDUCTION IN INSTRUCTIONAL PERSONNEL

When it has been decided that there shall be a reduction in the number of teachers or principals employed in the system, the following criteria shall be used in determining which individuals shall be dropped from employment:

(a) To the extent possible, the decrease shall be met by normal attrition such as retirement, resignation, leave of absence, etc.

(b) The requirements of the system to provide the most meaningful educational program to its pupils.

(c) The qualifications and experience of the individuals being reviewed in relation to the position(s) to be filled.

(d) The previous evaluations which have been made concerning the individuals being reviewed.

(e) If other considerations are substantially similar, a career teacher shall be given preference in retention over a probationary teacher.

Finding of fact number six (6) is conclusory and substantially similar to the conclusion made by the Board as set forth hereinabove. We are advertent to the fact that the selection and retention of program personnel is within the Board's expertise and express no inclination nor ability to endeavor to substitute or interpose our judgment for that of the Board. However, the blanket statement made in finding number six (6) that the selection process was carried out "in accordance with Board policy" does not afford us a basis to genuinely review the Board's conclusion stated in Finding of Fact seven (7) that plaintiff was "properly included within [the] group of professional staff designated . . . for termination of employment." There is nothing in the Board's decision with respect to subsections (b) and (d) of its policy which makes it impossible for us to determine if these criteria were used as the policy mandates that they "shall be used."

The Board's decision makes a general reference to "those areas of the Exceptional Children Program in which professional staff reductions were necessary . . .," but does not state what those areas are, and the basis for the reduction of force in them. The findings do not state what area plaintiff is considered to be in. There was considerable testimony and documentary evidence with respect to the duplication of headcounts in certain areas of the Exceptional Children Program. Plaintiff testified that he was certified to teach emotionally handicapped students and that he was a teacher of emotionally handicapped students in a self-contained classroom at E. K. Powe Elementary School. During cross-examination Dr. Warlick, Supervisor of Exceptional Children with the Durham City Board of Education, testified as follows:

Q. Is it correct you are not reducing the number of teachers who are teaching emotionally handicapped students for 1984 and '85 in the Durham City School System?

A. The number of positions, no.

Dr. McCallister, Assistant Superintendent of Personnel for the Durham City School System, testified that there were categories of teachers who were probationary, but were not affected by a reduction in staff because they were working in areas that are "not overstaffed due to the fact that students promote teaching positions." When Dr. McCallister was asked whether a person who has been certified to teach emotionally handicapped students

is the person who should be teaching emotionally handicapped students, his response was "absolutely." The auditor for the Division of Teacher Allotments/Student Accounting for the State Board of Education testified as follows:

Q. Could you tell us were the Durham City Schools within their cap [allowable percentage average with reduction in funding] for emotionally handicapped students in the 1984-85 school year?

A. Yes.

Q. So, they were not reduced any funds for emotionally handicapped students?

A. Not per cap, no.

Q. And, they were also accurately counted in the 1984-85 school year?

A. That's correct.

The absence of findings regarding the relationship of headcounts in areas of the Exceptional Children Program to the termination of plaintiff, as well as other deficiencies in the Board's findings, prevents us from discerning a substantive reason for the decision to terminate plaintiff.

Further, the transcript of the hearing reveals inconsistent and contradictory testimony by witnesses as to the weight each criterion in the Board's policy is to be given and as to how they were relied on in the case *sub judice*. For example, Dr. Warlick, under cross-examination, testified as follows:

Q. Okay. For—clarification, then, could you tell us specifically what the weighting—what weighting was given to each given category; i.e., certificate level, certification, years of experience, career status, et cetera, in the order of priority—in rank order of priority?

A. Well, the first issue—but, of course, this is looking at the entire program—would have been the issue of career status, or not having career status.

A major factor also is the area of needs within the school system.

Then, qualifications and experience of the teachers, I suppose.

This testimony by Dr. Warlick contradicts the priorities established by the policy that are supposed to be carried out. Subsection (e) of the policy states that career status is a consideration "[i]f other considerations are substantially similar." Dr. Warlick's testimony smacks of a last hired first fired approach to the termination of teachers. Dr. Warlick in later testimony reversed the prioritization of the criteria which should be considered in the decision making process:

Q. But, there again, is my question with regard to your quantitative analysis.

If you say your first issue part and parcel division occurs at career status—

A. (Interposing) Let me correct my previous statement.

Our first issue is the quality of service for the students. That is the first issue.

Q. And, second, then you would say is career status?

In other words, you shift that emphasis?

A. It's really very hard to distinguish, you know, when you get to career status versus experience. It really is.

However, Dr. Warlick, when asked to comment upon the reasoning for recommending that plaintiff be terminated, testified that "Mr. Taborn is most recently employed within the system. Has the least amount of experience." If, according to the Board's policy, this may be the only basis to terminate plaintiff's employment there was nothing in the Board's decision to the effect that plaintiff was terminated because he was the most recently employed and had the least amount of experience. We deem it significant to note that there was testimony which would greatly detract from such a finding. From the evidence adduced at the hearing it appears that the list of teachers within the Exceptional Children Program that were to be considered for termination was incomplete. The names of two teachers were omitted from the list. One teacher, Cathy Chapman, was in her first year of employment with a beginning date of employment of 20 August 1984,

which is subsequent to plaintiff's date of employment. There was testimony that Ms. Chapman was specifically hired to teach in the area of her certification, learning disabilities. However, the majority of testimony elicited on behalf of the Superintendent was that teachers were hired subject to subsequent assignment. The Board's findings do not resolve this area of conflict in the testimony given at the hearing. Moreover, we note that there were no findings made with respect to whether learning disabilities was one of the categories, for funding purposes, in which there was a miscount of students. We recognize that program decisions are entirely within the expertise of the Durham City Board of Education, and we do not seek to nor deem it wise or allowable under the law of this state for us to interpose our judgment in these matters. However, in order for this Court to grant a meaningful review, we find it necessary to vacate the Board's decision and remand the case for a new hearing.

[2]   In light of our decision to remand for a new hearing, we consider plaintiff's remaining Assignment of Error challenging the Board's decision to hold a hearing on the Superintendent's recommendation for his termination after the Board had previously voted to accept the Superintendent's recommendation. In this regard, plaintiff argues that the Board denied him a fair and impartial hearing. We disagree.

Plaintiff contends that the Board was not capable of providing him a fair and meaningful hearing after it had earlier voted to terminate him and then voted to rescind that termination. There is no legal basis for plaintiff's assertion that the Board's familiarity with the facts preclude a fair and impartial hearing. In *Thompson v. Wake County Board of Education*, 31 N.C. App. 401, 230 S.E. 2d 164 (1976), *reversed on other grounds*, 292 N.C. 406, 233 S.E. 2d 538 (1977), this Court disagreed with the argument pressed that a Board is necessarily biased when that board is in effect required to make the same finding twice. There was a fact in *Thompson, supra*, which plaintiff argues is distinguishable from the case *sub judice*, to wit: the Board in *Thompson, supra*, in the first instance acted as an investigative body and later was called upon to render a decision on the merits. However, the fact remains that the Board serves an administrative function and the procedures for reviewing its decisions are established by statute. The General Assembly has not provided for any other body, ad-

ministrative or otherwise, to render a decision on the termination of a teacher if the Board is familiar with the facts of the case. Since the General Assembly has designated the Board to serve this function and judges often hear cases more than once we see no reason to impose stronger constitutional compulsions on an administrative hearing body than on a court. *See generally FTC v. Cement Institute*, 333 U.S. 683, 92 L.Ed. 1010, 68 S.Ct. 793 (1947). In the case *sub judice*, the Superintendent realized that proper procedures had not been followed and that plaintiff had a right to notice and to be heard with respect to the pending recommendation of discharge. The Board rescinded its decision to terminate plaintiff and afforded him an opportunity to be heard. Due process requires no more for an impartial hearing. Analagously, as a consequence of our decision the Board will have to notify defendant of the reasons for the decision to discharge him as discussed *supra*, and hear the case, yet again. The principle is the same when we remand cases such as the case *sub judice*, we remand with the "presumption of honesty and integrity in those serving as adjudicator." *Withrow v. Larkin*, 421 U.S. 35, 47, 43 L.Ed. 2d 712, 724, 95 S.Ct. 1456, 1464 (1975).

[3] Plaintiff also argues that the departure of a board member during the hearing and her absence during the Board's deliberation denied him his due process right to a fair tribunal. It is true that the Board's adherence to established procedure in the case *sub judice* was less than exemplary. There is nothing in the record on appeal that would justify the departure of Ms. Copeland, but we find no authority which would justify our holding said departure to be a violation of plaintiff's due process rights. In *Sigmon v. Poe*, 391 F. Supp. 430 (W.D.N.C.), *affirmed*, 528 F. 2d 311 (1975), it was contended that the inattentiveness of a board member who did embroidery during the entire hearing constituted a violation of the right to be fairly heard. The Court in *Sigmon, supra*, expressed a sentiment which we share: "[t]his, again, while not inspiring confidence in attentiveness or impartiality, falls somewhat short of the fundamental unfairness which due process is designed to avoid." *Sigmon, supra*, at 433. Plaintiff's remaining Assignments of Error are not likely to recur during further proceedings to be held consistent with this opinion; therefore, we need not address them.

Vacated and remanded for further proceedings not inconsistent with this opinion.

Judges BECTON and COZORT concur.