LEO TABORN v. CLEVELAND HAMMONDS, as Superintendent of the Durham City Schools and DURHAM CITY BOARD OF EDUCATION

No. 487A88

(Filed 27 June 1989)

**Schools § 13.2— reduction in funding—reduction in force—rational basis**

The Durham City Board of Education was justified in reducing the number of teaching positions for its Exceptional Children Program, including plaintiff's position, after the Durham City Schools lost a substantial portion of the state and federal funds for that program because there was a rational basis for the decision to reduce teaching positions. When faced with funding reductions in a particular program, it was justifiable for the Board to fashion a remedy that was program specific, and a board of education is not required to look across its entire budget to provide the salary for teaching positions when money originally available becomes unavailable due to a reduction in funds for an external grant program. When N.C.G.S. § 115C-325(e)(1)l (1983) is read *in pari materia* with other relevant provisions of N.C.G.S. § 115C-325, it is apparent that the legislature intended to grant local school boards wide discretion in deciding whether to reduce personnel in response to decreased funding. The legislature intended that N.C.G.S. § 115C-142 benefit special education students by preventing funds appropriated for special education to be used for other purposes, and did not intend to provide special education teachers with greater protection against dismissal due to a reduction in force than that provided other career teachers. A career teacher is entitled to relief in such cases only upon showing that the board's action was personal, political, discriminatory, without a rational basis or simply a subterfuge to avoid the protections extended the teacher by law due to his or her status as a career teacher.

**Am Jur 2d, Schools §§ 75, 161, 184.**

ON appeal by the defendants pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 91 N.C. App. 302, 371 S.E. 2d 736 (1988), reversing and remanding the judgment of *Stephens, J.*, entered in Superior Court, DURHAM County, on 31 July 1987. Heard in the Supreme Court on 15 March 1989.

*Glenn, Bentley and Fisher, P.A., by Stewart W. Fisher, for the plaintiff appellee.*

*Spears, Barnes, Baker, Hoof & Wainio, by Marshall T. Spears, Jr. and Gary M. Whaley, for the defendant appellants.*

*Tharrington, Smith & Hargrove, by George T. Rogister, Jr., Ann L. Majestic and Jonathan A. Blumberg, for the North Carolina School Boards Association, amicus curiae.*

MITCHELL, Justice.

The issue before this Court is whether the Durham City Board of Education (hereinafter "the Board") was justified in reducing the number of teaching positions for its Exceptional Children Program, when the Durham City Schools had lost a substantial portion of the state and federal funds for that program. We conclude that the Board's findings and conclusions resulting in the adoption of its superintendent's recommendation to terminate teaching positions were supported by substantial evidence in light of the entire record submitted. Accordingly, we reverse the decision of the Court of Appeals which held to the contrary.

This case is on appeal for the second time. In *Taborn v. Hammonds*, 83 N.C. App. 461, 350 S.E. 2d 880 (1986) (hereinafter "*Taborn I*"), the Court of Appeals vacated a judgment of the Superior Court affirming a decision by the Board to discharge the plaintiff, Leo Taborn, a teacher of an emotionally handicapped class, during the middle of the school year. The Court of Appeals concluded that the Board's findings and conclusions did not support its decision to terminate the plaintiff's employment and remanded the case for a new hearing by the Board.

Thereafter, pursuant to the decision of the Court of Appeals in *Taborn I* remanding the case, the defendant Cleveland Hammonds, Superintendent of Durham City Schools, sent a letter to the plaintiff explaining Hammonds' reasons for recommending the plaintiff's dismissal. That letter included the following:

> As a result of a teacher audit by the North Carolina Department of Public Instruction in 1984, the Durham City Schools were not funded for the 1984-85 school year for the number of positions which were previously filled in our system for the Exceptional Children program. In order to adjust to this decrease in funding, it was necessary to take various actions. Insofar as these actions were to affect teachers within the system, I followed the Durham City Schools' policy regarding Reduction in Instructional Personnel. A copy of this policy is attached to this letter and incorporated herein for your reference.
>
> At my direction a committee received [sic] all available records of the teachers in the Exceptional Children program

against the responsibility of the system to provide a meaningful educational program to our pupils. After determining that the system was retaining teachers properly certified and qualified in the areas to be served, significant factors in the selection for dismissal were the extent of educational credentials and teaching experience in the North Carolina Public Schools. In reviewing your credentials it was determined that you had the lowest certification level, A, and the least amount of previous teaching experience in the North Carolina Public Schools. I also determined that a qualified and experienced teacher was available to transfer into the position which you were teaching. For these reasons your name was included among those whom I recommended to the Board for dismissal no sooner than the end of the first semester of that school year.

On 25 February 1987, the Board held a second administrative hearing in accord with the decision of the Court of Appeals in *Taborn I* and entered a written decision in which it found facts including, *inter alia*, the following:

3. That as a result of the head count audit of the Exceptional Children Program of the Durham City Schools performed by the staff of the North Carolina Department of Public Instruction . . . the Durham City Schools were notified . . . that for the 1984-85 school year the previously indicated initial allotment of 970 students for the federally funded EHA, Title VI-B program was being reduced to 726 students and the previously indicated initial allotment of 924 students weighted within caps for State Aid fund was being reduced to 748 students weighted within caps.

4. That the above mentioned reduced head count resulted in the initial proposed allotment for EHA, Title VI-B program being reduced by $58,560.00 and the State Aid Exceptional Children initial proposed allotment being reduced by $211,150.72.

5. That because of the aforementioned loss of funds, the Exceptional Children Program, which had been staffed in reliance upon the initial proposed allotments, did not have sufficient funds for personnel expenses to pay all the professional

and para-professional persons who had originally been assigned to said program for the 1984-85 school year.

6. That if the budget shortfall were not addressed during the 1984-85 school year, the deficit would grow and would have to be suffered in later school years.

7. That the superintendent determined that the budget deficit needed to be addressed during 1984-85 school year rather than extending the deficit into later school years.

8. That at the request of the Superintendent and in accordance with Board policy, the Director of Exceptional Children and the Director of Instruction reviewed and made recommendations for consolidation and elimination of positions to serve the 1984-85 Exceptional Children Program enrollment within the State guidelines without detriment to the system's obligation to provide the most meaningful educational program to its students in accordance with its policy on Reduction in Instructional Personnel.

9. That is what was recommended and approved that six aide positions be eliminated in non-self contained classes, that one teaching position be eliminated from the Speech Language Therapy Service, that two teaching positions be eliminated from the Academically Gifted, that one EMH teaching position be eliminated from Burton Elementary, that one EMH position be eliminated from Holton Middle, and that one EMH resource services position be consolidated for the Fayetteville Street and Y. E. Smith Elementary Schools.

Based on the foregoing findings and additional findings relating to the selection of the plaintiff as one of the professional personnel to be terminated, the Board made written conclusions as follows:

1. That the decrease in funding for the Exceptional Children Program . . . was based on a corrected head count . . . [according to State and Federal funding guidelines].

2. That this constituted a justifiable decrease in funding; and a reduction in professional staff was an appropriate response to this decrease.

3. The Board policy regarding Reduction in Instructional Personnel and State law were followed in making the selection of which members of the professional staff were to be recommended for dismissal.

4. That the recommendation of the Superintendent that Leo Taborn be dismissed is substantiated by the preponderance of evidence, and his termination . . . pursuant to the notification given to him by the Superintendent is hereby ratified.

The plaintiff gave notice of appeal pursuant to N.C.G.S. § 115C-325(n) to the Superior Court, Durham County. After a hearing, judgment was entered in Superior Court on 31 July 1987 as follows:

Upon review and consideration of the whole record and the contentions of the parties, in light of the remand from the North Carolina Court of Appeals . . ., the Court is of the opinion that the Superintendent and his staff have sufficiently explained the basis upon which Leo Taborn was terminated from employment; that the Board policy was followed; that the Superintendent's decision has a rational basis as reflected in the record; and that the findings of fact and the conclusions of the Durham City Board of Education in regards to Leo Taborn should be sustained; and it is hereby Ordered that the appeal of Leo Taborn in this action be dismissed.

The plaintiff again appealed to the Court of Appeals. A divided panel of the Court of Appeals entered a decision in which the majority reversed the judgment of the Superior Court which had sustained the Board's action in dismissing the plaintiff. *Taborn v. Hammonds*, 91 N.C. App. 302, 371 S.E. 2d 736 (1988) (hereinafter "*Taborn II*"). The majority in the Court of Appeals accepted the finding—from uncontested evidence—that there had in fact been a decrease in funding for the Exceptional Children Program. The majority concluded that the Board's method of selecting the plaintiff Taborn as one of the teachers to be terminated was without error. The majority also concluded, however, that the Superior Court had erred in sustaining the action of the Board in dismissing Taborn, because the findings and conclusions of the Board did not sufficiently support its decision to terminate *any* teaching

*positions* in the Exceptional Children Program. Therefore, the majority reversed the judgment of the Superior Court and remanded this case for another hearing on this issue by the Board.

In his dissenting opinion in the Court of Appeals, Judge Wells dissented only from that part of the majority opinion which concluded that the Board's findings and conclusions did not support the decision to reduce the *number* of teaching positions in the Exceptional Children Program. Therefore, our review upon the defendant's appeal of right by reason of Judge Wells' dissent is limited to a consideration of issues arising from that decision by the Board. App. R. 16(b). On 4 January 1989, we denied the plaintiff's petition for a writ of certiorari to consider additional issues.

Although our statutes provide no specific standard for judicial review of an appeal of a decision of a school board, we have held that the standards for judicial review now set forth in N.C.G.S. § 150B-51(b) are to be applied. *Overton v. Board of Education*, 304 N.C. 312, 316-17, 283 S.E. 2d 495, 498 (1981) (applying former N.C.G.S. § 150A-51, rewritten in 1985 N.C. Sess. Laws ch. 746, § 1 and recodified as N.C.G.S. § 150B-51). Therefore, a school board's decision must be reviewed under the "whole record" test. *Id.; Faulkner v. New Bern-Craven Board of Education*, 311 N.C. 42, 316 S.E. 2d 281 (1984). Under that test the reviewing court may not replace the board's judgment with its own, even though the court could justifiably reach a different result if the matter were before it *de novo*. Instead, the reviewing court must consider, *inter alia*, whether the board's findings and conclusions are supported by substantial evidence in view of the entire record as submitted. *Id.* In determining the substantiality of the evidence supporting the board's decision, the court must take into account all of the evidence, including that which fairly detracts from the board's findings, conclusions and ultimate decision. *Id.*

Turning to an examination of the entire record in the present case, it is apparent that three major events led to the plaintiff's dismissal. First, there was a substantial reduction in funding for the Exceptional Children Program. Second, the Board made the administrative decision to reduce professional personnel in response to the decrease in funding. Third, the Board approved the Superintendent's recommendation that the defendant be included

among the employees dismissed. As we have indicated, the issues before us as a result of the defendant's appeal to this Court arise only from the second event—the Board's decision to reduce the *number* of teaching positions in the Exceptional Children Program in response to the decrease in funding for that program.

The defendants argue that the Court of Appeals' decision in *Taborn II* in effect required the Board to show that it had exhausted all available or potential sources for reduction in expenses in the entire school system in order to justify a reduction in the number of teaching positions due to decreased funding. They contend that this result is contrary to basic rules of statutory interpretation, relevant case law and established principles of judicial restraint.

In response, the plaintiff argues that a review of the entire record shows that the Board failed to establish that decreased funding for the Exceptional Children Program justified the decision to eliminate teaching positions in that program. He contends that a review of the entire record shows that the Board automatically decided to eliminate teaching positions when confronted with the decrease in funding. He also maintains that the Court of Appeals was correct in finding that N.C.G.S. § 115C-325(e)(1)l prohibits an automatic decision to reduce teaching positions as a response to a funding cut.

The statute states in pertinent part that no career teacher shall be dismissed or demoted except for, among other specifically listed reasons, a "justifiable decrease in the number of positions due to . . . decreased funding . . . ." N.C.G.S. § 115C-325(e)(1)l (1983). Further, N.C.G.S. § 115C-325(m)(1) extends the same protection to probationary teachers, such as the plaintiff, when they are to be dismissed during the school year.

The Court of Appeals concluded that the Board's reduction in teaching staff was automatic and not "justifiable" under N.C.G.S. § 115C-325(e)(1), in part because the Board did not explain why, in light of evidence that there was a surplus in the overall budget for the school system, the funding reduction was not absorbed within the entire budget or spread throughout the whole school system. *Taborn II*, 91 N.C. App. at 308, 371 S.E. 2d 739-40. In reaching this conclusion the Court of Appeals also observed that

the Board had not explained why it had not sought additional funds from the County Commissioners.

We conclude that when faced with funding reductions in a particular program, it was "justifiable" for the Board to fashion a remedy that was program specific. A board of education is not required to look across its entire budget to provide the salary for teaching positions when money originally available becomes unavailable due to a reduction of funds for an external grant program.

In construing other provisions of N.C.G.S. § 115C-325, we have stated the central principles of statutory construction to be applied as follows:

> " 'In the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms, and its reason and intention will prevail over the strict letter. When the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt and the remedy in view, and the intention is to be taken or presumed according to what is consonant with reason and good discretion.' "

*Faulkner v. New Bern-Craven County Board of Education*, 311 N.C. 42, 58, 316 S.E. 2d 281, 290-91 (1984) (quoting *State v. Humphries*, 210 N.C. 406, 410, 186 S.E. 473, 476 (1936) (quoting I Kent Comm., 461)). We further stated in *Faulkner*: "[A]ll statutes relating to the same subject matter shall be construed *in pari materia* and harmonized if this end can be attained by any reasonable interpretation." *Id.* at 58, 316 S.E. 2d at 291 (1984).

In deriving the meaning of subsection (e)(1)l, we must examine it in the general context of North Carolina's public school laws, paying particular attention to the other provisions of N.C.G.S. § 115C-325. When subsection (e)(1)l is read *in pari materia* with other relevant provisions of N.C.G.S. § 115C-325, it is apparent that the legislature intended to grant local school boards wide discretion in deciding whether to reduce personnel in response to decreased funding.

First, the legislature has explicitly excluded professional review panels from reviewing recommendations for teacher dismissal due to decreased funding. N.C.G.S. § 115C-325(e)(2) (1983).

Subsection (e) of N.C.G.S. § 115C-325 lists fourteen grounds upon which a board of education may dismiss a career teacher. In regard to thirteen of these grounds, when a superintendent recommends a career teacher's dismissal, the teacher may ask that the recommendation be reviewed by a panel of the Professional Review Committee. Therefore, of the fourteen grounds for dismissal, the only one for which a career teacher is not given the option of review by a panel of the Professional Review Committee is dismissal due to a reduction in the system's work force under N.C.G.S. § 115C-325(e)(1)l—the provision at issue here.

The exclusion of reduction-in-force decisions from review by the Professional Review Committee clearly was a deliberate legislative act. An amendment enacted in 1983 and entitled "An Act to Clarify the Provisions of the Fair Employment and Dismissal Act" specifically provides in part that:

> Provisions of this section which permit appointment of, and investigation and review by, a panel of the Professional Review Committee shall not apply to a dismissal or demotion recommended pursuant to G.S. § 115C-325(e)(1)l.

N.C. Sess. Laws, ch. 770 (1983) (codified as N.C.G.S. § 115C-325(e)(2) ). This amendment buttresses our conclusion that the legislature intended that reduction-in-force decisions remain within the discretion and authority of the board of education.

As noted in *Goodwin v. Goldsboro Bd. of Educ.*, 67 N.C. App. 243, 247, 312 S.E. 2d 892, 895 (1984), a reduction-in-force decision pursuant to N.C.G.S. § 115C-325(e)(1)l is an administrative decision. Such decisions do not necessarily involve evaluation of a teacher's performance; instead, they require the balancing of the needs and resources of the school system and an administrative decision as to what action is appropriate. In such situations, courts must not allow their preferences to replace those of the elected boards of education.

Perhaps reduction-in-force decisions have not been made subject to review by a panel of the Professional Review Committee because local boards of education are in the best position to make such decisions and, also, because dismissal due to a reduction-in-force does not impugn the professional reputation of affected teachers, as performance-based dismissal does. In any event, the

legislature quite clearly has chosen to provide reduced procedural protections for teachers discharged due to a reduction in the number of teaching positions.

In contrast to a performance-based dismissal, a dismissal due to a reduction-in-force should not carry negative implications as to the qualifications of the discharged teachers. In fact, the legislature has granted priority reemployment rights to career teachers dismissed under N.C.G.S. § 115C-325(e)(1)l due to a reduction-in-force. N.C.G.S. § 115C-325(e)(2) prescribes these reemployment rights as follows:

> When a career teacher is dismissed pursuant to G.S. 115C-325(e)(1)l . . . his name shall be placed on a list of available teachers to be maintained by the board. Career teachers whose names are placed on such a list shall have a priority on all positions for which they are qualified which become available in that system for the three consecutive years succeeding their dismissal.

These priority rights of career teachers dismissed under the reduction-in-force subsection reflect the legislature's recognition of fundamental differences between a performance-based dismissal and a dismissal under N.C.G.S. § 115C-325(e)(1)l due to a reduction in teaching positions. North Carolina's reduced procedural and increased reemployment protections for teachers dismissed due to a reduction-in-force are consistent with the prevailing practice in other states. *See, e.g.,* Ariz. Rev. Stat. Ann. § 15-544(C) (1988); Ky. Rev. Stat. §§ 161.790 and 161.800 (1988); Mich. Comp. Laws Ann. §§ 38.101, sec. 1 and 38.105, sec. 5 (1988); R.I. Gen. Laws §§ 16-13-3 and 16-13-6 (1988).

Next, in deriving the meaning of N.C.G.S. § 115C-325(e)(1)l, we turn to examine N.C.G.S. § 115C-142 which provides as follows:

> Notwithstanding any of the other provisions of this Article, it is the intent of the General Assembly that *funds* appropriated by it for the operation of programs of special education and related services by local school administrative units *not be reduced*; rather, that adequate funding be made available to meet the special educational and related services *needs of children* with special needs, without regard to which

State or local department, agency, or unit has the child in its care, custody, control, or program.

N.C.G.S. § 115C-142 (1987) (emphasis added). In *Taborn I*, the Court of Appeals construed this nonreduction provision as entitling special education teachers to special protection in situations of decreased funding. 83 N.C. App. at 466, 350 S.E. 2d at 883. We conclude, however, that the Court of Appeals misinterpreted this statute.

We do not believe that the General Assembly intended this statute to provide special education teachers with greater protection against dismissal due to a reduction-in-force than that provided other career teachers. Instead, the legislature intended that N.C.G.S. § 115C-142 benefit special education *students*. The statute was intended to prevent funds appropriated for special education being used for other purposes. It was not designed to provide enhanced job protection for special education teachers.

Next, we examine the overall purpose of N.C.G.S. § 115C-325 in determining the legislative intent expressed in the subsection involved in this case. The purpose of the statute is "to provide teachers of proven ability for the children of this State by protecting such teachers from dismissal for political, personal, arbitrary or discriminatory reasons." *Taylor v. Crisp*, 286 N.C. 488, 496, 212 S.E. 2d 381, 386 (1975) (construing former N.C.G.S. § 115-142 (Cum. Supp. 1971)). This overall purpose provides the focus for interpreting the requirement of subsection (e)(1)l that any decrease in the number of teaching positions due to a decrease in funding be "justifiable." This basic requirement mandates that the board's action be based upon a rational decision that reducing teaching positions is *one* appropriate response to the decrease in funds. If the teacher can show, however, that there is no rational basis for the decision or that it is based on personal, political or discriminatory motives or is a subterfuge to avoid rights arising from a teacher's status as a career teacher, then such action by the board is not "justifiable."

This interpretation protects the rights of career teachers while not unreasonably restricting school boards exercising their most basic administrative functions. It also incorporates the deference to school board decisions mandated by statute: "In all actions brought in any court against a local board of education, the

order or action of the board shall be presumed to be correct. . . ."
N.C.G.S. § 115C-44(b) (1988).

The Court of Appeals concluded here that the Board had not
justified the reduction-in-force because it had not explained ade-
quately how it reached its decision. In fact, the Board stated the
basis for its decision; the remaining funds were inadequate to
meet the salaries of existing personnel, and program quality could
be maintained with a smaller instructional staff. This is a rational
basis for the Board's decision, and no more is required under
N.C.G.S. § 115C-325(e)(1)l — the reduction-in-force subsection of the
statute.

Although not controlling here, we note that our decision finds
support in the decisions of the courts of other jurisdictions. These
courts generally have held that local boards of education retain
discretion to reduce teaching positions due to decreased funding
unless it is shown that the decision to do so is irrational, ar-
bitrary, capricious or a subterfuge to avoid tenure laws. *See, e.g.,*
*Pocahontas Community School Dist. v. Levene,* 409 N.W. 2d 698,
700 (Iowa App. 1987); *Laird v. Independent School Dist. No. 317,*
346 N.W. 2d 153, 156 (Minn. 1984); *Sells v. Unified School Dist.*
*No. 429,* 231 Kan. 247, 249, 644 P. 2d 379, 381 (1982); *Paradis v.*
*School Administrative Dist.,* 446 A. 2d 46, 50-51 (Me. 1982);
*Williams v. Seattle School Dist.,* 97 Wash. 2d 215, 224, 643 P. 2d
426, 432 (1982).

In *May v. Alabama State Tenure Comm.,* 477 So. 2d 438 (Ala.
App. 1985), for example, a tenured social studies teacher dis-
missed due to declining enrollments claimed that the board could
not dismiss her "if any combination, change or alteration in the
system could be made to accommodate" her. *Id.* at 439. Specifical-
ly, she contended that because she was able to teach other sub-
jects, the board was required to shift personnel to accommodate
her tenured status. The Alabama Tenure Law, like the North Car-
olina statute, N.C.G.S. § 115C-325(e)(1)l, allows dismissals for a
"justifiable decrease in the number of teaching positions." Ala.
Code § 16-24-8 (1988). In applying this' provision, the Alabama
court recognized that when faced with the possibility of reducing
positions, "much must be left to the 'enlightened discretion' of the
Board after considering the entire situation." *Id.* at 440, quoting

*Woods v. Bd. of Educ.*, 259 Ala. 559, 67 So. 2d 840 (1953). The court refused to set aside the decision of the board.

Our Court of Appeals' decision under review here requires that boards of education facing a reduction in funding show that they have considered and rejected other budget options before reducing teaching staff. This requirement infringes on the discretion of local boards to allocate funds according to their views of the best interests of their students. Moreover, the decision of our Court of Appeals would result in courts interjecting their views into matters legislatively delegated to duly elected local boards of education for the exercise of their expertise and discretion. This Court has repeatedly warned against such usurpation of the authority given elected local boards of education by the legislature. *See, e.g., Faulkner v. New Bern-Craven County Bd. of Educ.*, 311 N.C. 42, 316 S.E. 2d 281 (1984) (reviewing court should not substitute its views for those of board).

Courts in other jurisdictions also have held that a school board need not exhaust other available options before dismissing tenured staff. In *California School Employees Ass'n v. Pasadena Unified School Dist.*, 71 Cal. App. 3d 318, 139 Cal. Rptr. 633 (1977), a school board had ordered a layoff of employees because of a lack of funds. In challenging the layoffs, the employees argued that the board did not have to do so because it had "undistributed reserves sufficient . . . to maintain all . . . employees in their former positions." 71 Cal. App. 3d at 320, 139 Cal. Rptr. at 634. The court responded:

> Plaintiff's basic argument is that there cannot be a 'lack of funds' so long as a reserve account is in existence. Essentially the argument means that there cannot be a lack of funds unless the school district is bankrupt. This contention is obviously without merit.

*Id.* at 321, 139 Cal. Rptr. at 634. The court went on to state that the "determination of the amount needed for reserves is committed to the discretion of the board . . . [and] that determination could not be set aside by a court unless it was 'fraudulent or so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law.'" 71 Cal. App. 3d at 322, 139 Cal. Rptr. at 635.

The relevant cases from this and other jurisdictions, as well as the language of N.C.G.S. § 115C-325 and related statutes, support our conclusion that the issue to be resolved by our courts in reviewing a teacher dismissal under N.C.G.S. § 115C-325(e)(1)1 is whether the board's decision to reduce teaching positions is supported by a rational basis. Given the presumption in favor of the board's decision under N.C.G.S. § 115C-44(b), a career teacher is entitled to relief in such cases only upon showing that the board's action was personal, political, discriminatory, without a rational basis or simply a subterfuge to avoid the protections extended the teacher by law due to his or her status as a career teacher. The role of the reviewing court is to assure the proper application of this standard, not to substitute its preferences for those of the board.

Applying this standard, we conclude that the Board in the present case justifiably reduced the teaching staff in a program for which funds had been significantly decreased, the major use of such funds had been for staff salaries, and program quality could be maintained with fewer teachers. We should not be understood as endorsing the Board's action of dismissing a teacher of emotionally handicapped students in the middle of a school year in order to save the relatively small sum of $7,840.00, half of the teacher's annual salary. That is not our proper function. Nor may we decide whether this was the wisest option for the Board to choose when it might result in disturbing a stable situation for students whose emotional balance was, at best, fragile. Furthermore, we do not decide whether this was the fairest course of action when the reason for the plaintiff's dismissal was not his performance but a financial exigency created by an inaccurate count of students in the Exceptional Children Program by an administrator who did not lose her job as a result of the mistake. We hold only that, based upon the entire record, there was a rational basis for the Board's decision to reduce teaching positions in response to the reduction of funds in the present case and that the judgment of the Superior Court sustaining that decision was, therefore, correct. Accordingly, we must reverse the decision of the Court of Appeals.

Reversed.