STEPHENS, Judge.
*285 Defendant State of North Carolina ("the State") argues that the trial court erred in granting summary judgment in favor of Plaintiffs North Carolina Association of Educators, Inc. ("NCAE"), Nixon, Holmes, *286 Beatty, Wallace, and deVille based on the court's conclusion that the State's enactment of legislation repealing career status teachers' benefits under section 115C-325 of our General Statutes violated Article I, Section 10 of the United States Constitution and Article I, Section 19 of the North Carolina Constitution. The State also argues that the trial court erred in failing to strike certain portions of the affidavits Plaintiffs submitted in support of their motion for summary judgment. Plaintiffs cross-appeal, arguing that the trial court erred in denying summary judgment to Plaintiff Link based on the court's conclusion that, as a probationary teacher who had not yet earned career status, he lacked standing to challenge the General Assembly's repeal of section 115C-325. After careful consideration, we hold that the trial court did not err and we consequently affirm its orders.
I. Background and Procedural History
A. Legislative Background
In 1971, our General Assembly enacted a statutory scheme ("the Career Status Law") to govern the employment and dismissal of our State's public school teachers. See An Act to Establish an Orderly System of Employment and Dismissal of Public School Personnel, 1971 N.C. Sess. Laws ch. 883. For more than four decades following its passage, the Career Status Law, codified in its most recent form at N.C. Gen. Stat. § 115C-325 (2012), provided all public school teachers in North Carolina with certain procedural guarantees regarding the terms of their employment and the reasons they could be terminated.
Under the Career Status Law, teachers who were employed by a public school system for fewer than four consecutive years on a full-time basis were deemed to be "probationary" teachers. Id. § 115C-325(a)(5). These probationary teachers were employed from year to year pursuant to annual contracts, which school boards could choose to "non-renew" at the end of a school year for any cause the boards deemed sufficient, so long as the non-renewal was not "arbitrary, capricious, discriminatory, or for personal or political reasons." Id. § 115C-325(m)(2). After a probationary teacher completed four consecutive years as a full-time teacher, that teacher became eligible for career status, which was granted or denied by a majority vote of the local school board. Id. § 115C-325(c)(1). Teachers who achieved career status would "not be subjected to the requirement of annual appointment." Id. § 115C-325(d)(1). Instead, career status teachers were employed on the basis of continuing contracts and could only be dismissed, demoted, or relegated *287 to part-time status for one of fifteen statutorily enumerated reasons, including, inter alia, "[i]nadequate performance," "[i]nsubordination," and "[n]eglect of duty." Id. § 115C-325(e)(1). Moreover, the Career Status Law further provided that, before a career status teacher could be dismissed, demoted, or relegated to part-time status, the school board was required to provide that teacher with notice, an explanation of the charges, and, if requested, a hearing before the board or an impartial hearing officer. Id. § 115C-325(h)(2), (3). In those cases in which a career status teacher chose to have a hearing before a hearing officer, that teacher had the right "to be present and to be heard, to be represented by counsel and to present through witnesses any competent testimony relevant to the issue of whether grounds for dismissal or demotion exist or whether the procedures set forth in [the statute] have been followed." Id. § 115C-325(j)(3).
On 24 July 2013, our General Assembly repealed the Career Status Law, both prospectively and retroactively, by enacting Sections 9.6 and 9.7 ("the Career Status Repeal") of the Current Operations and Capital Improvements Appropriations Act of 2013, which Governor Pat McCrory subsequently signed into law as S.L. 2013-360. Under the Career Status Repeal, as of 1 August 2013, *5 any teacher who had not achieved career status before the beginning of the 2013-14 school year will never be granted career status, but will instead, with limited exceptions, be employed on the basis of one-year contracts until 2018. See 2013 N.C. Sess. Law 360 § 9.6(f). Further, as of 1 July 2018, the Career Status Repeal revokes the career status of all teachers who had previously earned that status pursuant to the Career Status Law. Id. § 9.6(i). Instead, all teachers will be employed on one-, two-, or four-year contracts that can be non-renewed at their school board's discretion on any basis that is not "arbitrary, capricious, discriminatory, for personal or political reasons, or on any basis prohibited by State or federal law." Id. § 9.6(b). Moreover, the Career Status Repeal provides no right to a hearing for former career status teachers; although such teachers will be permitted to request a hearing after receiving notice of non-renewal, local school boards will have unfettered discretion to decide whether or not to hold one. Id. Finally, the Career Status Repeal's "25% Provision" mandates that before the beginning of the 2014-15 school year, school districts must select one quarter of their teachers with at least three years of experience and offer them four-year contracts, providing for a $500 raise in each year of the contract, in exchange for their "voluntarily relinquish[ing] career status." Id. § 9.6(g), (h). *288 B. Procedural History
On 17 December 2013, NCAE and six public school teachers filed a complaint in Wake County Superior Court seeking declaratory and injunctive relief based on their allegations that the Career Status Repeal amounts to both a taking of property without just compensation in violation of Article I, Section 19 of the North Carolina Constitution, and an unconstitutional impairment of their contractual rights under Article I, Section 10 of the United States Constitution. The State filed an answer and motion to dismiss pursuant to N.C.R. Civ. P. 12 on 17 January 2014. Plaintiffs then filed a motion for summary judgment pursuant to N.C.R. Civ. P. 56 on 10 March 2014.
In support of their Rule 56 motion for summary judgment, Plaintiffs submitted affidavits from:
• NCAE president Rodney Ellis, whose nonprofit organization's membership includes thousands of public school teachers, administrators, and education support personnel who either had already attained career status or would have been eligible for it in the coming years, and who, Ellis explained, relied on the Career Status Law for "peace of mind because they know that any issues implicating their jobs will be handled fairly and with due process;"
• Plaintiffs Nixon, Holmes, Beatty, Wallace, and deVille, each of whom are public school teachers who relied on the statutory promise of career status rights in exchange for meeting the requirements of the Career Status Law in accepting their teaching positions, had already attained career status prior to the Law's repeal, and considered its protections to be a fundamental part of their overall compensation that offsets their relatively low pay and allows them the opportunity to grow and improve by being innovative in the classroom, as well as the ability to advocate for their students by raising concerns about instructional issues to administrators without fear of losing their jobs;
• Plaintiff Link, a public school teacher who had not yet attained career status before the Career Status Repeal but would have been eligible for it by the end of the 2013-14 school year and who relied on the statutorily promised opportunity to earn the protections career status provides when he chose to accept a teaching position here in North Carolina over a job offer in Florida;
• eight public school administrators who explained that career status protections help attract and retain teachers despite the relatively *289 low salaries established by State salary schedules; that the Career Status Law's four-year probationary period provided more than adequate time for school districts to evaluate teachers and make informed decisions that ensure *6 career status is only granted to teachers who have proven their effectiveness; that the Career Status Law already provided school administrators with sufficient tools to discipline and/or dismiss teachers who have already earned career status and thus did not impede their ability to remove such teachers for inadequate performance; and that although, in the vast majority of cases when a school district seeks removal of a career status teacher, the teacher agrees to resign without a hearing, on the few occasions when hearings do occur, the process is not onerous for the district;
• Representative Richard Glazier, who represents North Carolina's 44th district in the State House of Representatives and explained that before the Career Status Repeal was enacted as part of the Appropriations Act, the House had already passed legislation aimed at reforming the Career Status Law in the form of House Bill 719, which would have "added definitions of teacher performance evaluation standards, teacher performance ratings, and teacher status, thus creating greater consistency in the determination of career status and revocation of career status based on evaluation ratings," by a bipartisan and nearly unanimous vote of 113-to-1; and
• labor economist Jesse Rothstein, who explained that the job security afforded by career status functions as a valuable employment benefit for North Carolina's teachers insofar as it offsets their lower salaries relative to other professions and other teachers in almost every other state in the country, and also serves the State's interest in running an efficient system of public education by helping to recruit and retain experienced and effective teachers who might otherwise leave the profession; by ensuring that non-retention decisions are made in a timely way in order to remove ineffective teachers from the classroom more quickly; and by reducing the need for expensive and disruptive annual retention evaluations for career status teachers, thereby enabling school districts to focus their resources, and teachers to focus their time and energy, on classroom instruction.
In addition, Plaintiffs also submitted resolutions adopted by the Boards of Education of Brunswick, Carteret, Chatham, Cleveland, Craven, Cumberland, Guilford, Haywood, Jackson, Lee, Lenoir, Macon, Onslow, Orange, Person, Robeson, Rockingham, Rowan, Transylvania, Tyrrell, Wake, and Washington Counties calling on our General Assembly to *290 repeal the Career Status Repeal's 25% Provision because it is too vague to provide any discernible standard for determining who should qualify for the four-year contracts and bonuses and also provides no funding beyond the first year.
In opposition to Plaintiffs' motion for summary judgment, the State submitted affidavits from Terry Stoops, a policy analyst at the John Locke Foundation, and Eric A. Hanushek, a senior fellow at the Hoover Institute. Citing North Carolina students' low scores on standardized tests and arguments by Hanushek and other researchers that raising the quality of the teacher workforce is the key to raising student achievement, Stoops defended the Career Status Repeal because it "will make it easier for public school administrators and school boards to remove ineffective tenured teachers from the classroom" and "will likely produce a much-needed surge in student performance, particularly for public school students in low-income and low-performing schools." For his part, Hanushek described how his research demonstrated that the quality of teachers is the most important factor in maximizing student learning but that teacher quality is difficult to measure and new metrics for best assessing teacher quality are ever-evolving, which means that granting teachers tenure not only makes it more difficult to remove ineffective teachers but also "severely restricts the ability of the schools to use updated teacher performance information in making personnel decisions." Hanushek took issue with aspects of Rothstein's analysis of the Career Status Law's systemic benefits but provided no specific evidence that career status protections adversely impact the quality of education *7 North Carolina's public school children receive.
On 12 May 2014, the trial court held a hearing on Plaintiffs' Rule 56 motion for summary judgment. During that hearing, the State submitted a document entitled "Inadmissible Provisions of Affidavits Submitted in Support of Plaintiffs' Motion for Summary Judgment," which asked the trial court to disregard portions of Plaintiffs' affidavits consisting of hearsay statements, conclusions as to the legal issues in the case, and statements regarding the impact of career status and its repeal on all teachers that the State contended could not have been based on any individual affiant's personal knowledge. In an order entered 6 June 2014, the trial court explained that it had treated the State's request as a motion to strike, which it granted with regard to the portions of Plaintiffs' affidavits that consisted of legal conclusions or inadmissible hearsay, but otherwise denied.
That same day, the trial court entered a separate order granting in part and denying in part Plaintiffs' motion for summary judgment.
*291 In support of its order, the trial court found as an undisputed material fact that
[Plaintiffs] were statutorily promised career status rights in exchange for meeting the requirements of the Career Status Law. When they made their decisions both to accept teaching positions in North Carolina school districts and to remain in those positions, they reasonably relied on the State's statutory promise that career status protections would be available if they fulfilled those requirements. The protections of the Career Status Law are a valuable part of the overall package of compensation and benefits for [P]laintiffs and other teachers, benefits that they bargained for both in accepting employment as teachers in North Carolina school districts and remaining in those positions. From the perspective of school administrators, career status protections help attract and retain teachers despite the low salaries established by State salary schedules.
After additional findings that the four-year probationary period "ensure[s] that career status is only granted to teachers who have proven their effectiveness" and that the Career Status Law does not impede school administrators' ability to remove career status teachers whose performance is inadequate, the court found as an undisputed material fact that "[t]here is no evidence that the Career Status Law prevents North Carolina school districts from achieving the separation of teachers when they believe dismissal is necessary. School administrators are able to make all necessary personnel changes within the framework of the Career Status Law."
In light of these undisputed material facts, the trial court concluded that the Career Status Repeal violated Article I, Section 10 of the United States Constitution. The trial court based this conclusion on its application of the three-factor test articulated by the United States Supreme Court in U.S. Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) to determine whether a state law violates the Contract Clause. As to the first factor, the trial court concluded based on the United States Supreme Court's holding in Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685 (1938), and our Supreme Court's holdings in Faulkenbury v. Teachers' & State Employees' Retirement Sys. of N.C., 345 N.C. 683, 483 S.E.2d 422 (1997), Bailey v. State, 348 N.C. 130, 500 S.E.2d 54 (1998), and Wiggs v. Edgecombe Cnty., 361 N.C. 318, 643 S.E.2d 904 (2007), that "[a]ll teachers who earned career status before the [26 July 2013]
*292 enactment of the Career Status Repeal have contractual rights in that status and to the protections established by the Career Status Law." As to the second factor, the trial court concluded that "[b]y eliminating those protections, the Career Status Repeal substantially impairs the contractual rights of career status teachers." As to the third factor, the trial court concluded that this impairment of contractual rights "was not reasonable and necessary to serve an important public purpose," given that the "Career Status Repeal does not further any public purpose because the undisputed facts demonstrate that, under the Career Status Law, school administrators already have the ability to dismiss career status teachers for inadequate performance whenever necessary." After noting that "eliminating career status *8 hurts North Carolina public schools by making it harder for school districts to attract and retain quality teachers," the trial court also concluded that "[e]ven if there was an actual need for school administrators to have greater latitude to dismiss ineffective career status teachers, that objective could have been accomplished through less drastic means, such as by amending the grounds for dismissing teachers for performance-related reasons."
As a separate and independent ground for concluding that the Career Status Repeal is unconstitutional, the trial court also determined that it violated the Law of the Land Clause found in Article I, Section 19 of North Carolina's Constitution, which "has long been interpreted to incorporate a protection against the taking of property by the State without just compensation." In light of our Supreme Court's holding in Bailey that "[c]ontract rights, including those created by statute, constitute property rights that are within the Law of the Land Clause's guarantee against uncompensated takings," the trial court concluded that by eliminating career status teachers' contractual rights, "the Career Status Repeal constitutes a taking of property without compensation that violates the Law of the Land Clause beyond a reasonable doubt."
Consequently, the trial court granted summary judgment to Plaintiffs NCAE, Nixon, Holmes, Beatty, Wallace, and deVille, declared that Sections 9.6 and 9.7 of S.L. 2013-360 "are unconstitutional with regard to teachers who had received career status before [26 July 2013]," and-after concluding those teachers had no other adequate remedy at law and would suffer irreparable harm otherwise-permanently enjoined the State from implementing and enforcing the Career Status Repeal. The trial court also permanently enjoined the State from implementing and enforcing the 25% Provision, which it concluded "violates the constitutional vagueness doctrine because it provides no discernible, *293 workable standards to guide local school districts in its implementation" and is "inextricably tied" to the Career Status Repeal because it is "predicated on the revocation of career status as of 2018" and thus " cannot be severed from the unconstitutional revocation of career status." However, the trial court denied summary judgment on Plaintiff Link's claims, and therefore granted summary judgment to the State against all claims on behalf of teachers who had not yet earned career status, reasoning that such teachers lacked standing to bring these claims because "[p]robationary teachers who have not yet received career status do not have contractual rights that are protected by the Contract Clause or the Law of the Land Clause."
The State gave written notice of appeal on 3 July 2014, and, on 7 July 2014, Plaintiffs also gave written notice of appeal.
II. The State's Appeal
A. The Career Status Repeal violates the Contract Clause of the United States Constitution
The State argues that the trial court erred as a matter of law when it granted summary judgment to NCAE and the five teachers who had already earned career status based on its conclusion that the Career Status Repeal violated the Contract Clause. We disagree.
"The standard of review on appeal from summary judgment is whether there is any genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law." Hyatt v. Mini Storage on Green, ---N.C.App. ----, ----, 763 S.E.2d 166, 169 (2014) (citation, internal quotation marks, and brackets omitted). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." Id. (quoting N.C. Gen.Stat. § 1A-1, Rule 56 ). This Court applies a de novo standard of review to orders granting or denying a motion for summary judgment. Id.
To determine whether a state law violates the Contract Clause of the United States Constitution, our State's appellate courts apply a three-factor test that examines: "(1) whether a contractual obligation is present, (2) whether the [S]tate's actions impaired that contract, and (3) whether the *9 impairment was reasonable and necessary to serve an important public purpose." Bailey, 348 N.C. at 141, 500 S.E.2d at 60 (citation omitted). *294 (1) The Career Status Law creates contractual obligations
In the present case, as to the first factor, the State argues that the trial court erroneously concluded that Plaintiffs Nixon, Holmes, Beatty, Wallace, and deVille had contractual rights under the Career Status Law that were substantially impaired by the Career Status Repeal based on a misapplication of the relevant federal and state precedents the court relied on. Specifically, the State contends that Brand, Faulkenbury , and Bailey are easily distinguishable from the present facts because those cases involved benefits that were automatically conferred on public employees by express statutory promises, whereas here, career status depends upon completion of a four-year probationary period and a majority vote of the local school board. According to the State, this makes it more relevant to focus on Plaintiffs' individual employment contracts with their local school boards, which the State is quick to emphasize contain provisions stating that the contracts are, for example, "subject to the availability of federal and local funds" and "subject to the allotment of personnel by the State Board of Education and subject to the condition that the amount paid from State funds shall be within the allotment of funds." Thus, the State contends that even if Plaintiffs did have contractual rights to career status protections, those rights were not substantially impaired by the Career Status Repeal because Plaintiffs were always subject to termination due to the conditional language in their contracts. Our review of the relevant case law leads us to conclude that this argument is totally baseless.
In Brand, the United States Supreme Court reviewed a challenge to legislation that partially repealed Indiana's Teachers' Tenure Law, which provided that teachers who had served under annual contracts for five or more successive years and then entered into a new contract would be considered "permanent" teachers with indefinite, continuing contracts which could be terminated only after notice and a hearing and only for statutorily enumerated reasons. 303 U.S. at 102-03, 58 S.Ct. at 447, 82 L.Ed. at 692. Indiana's legislature subsequently amended the Teachers' Tenure Law to exclude teachers employed by "township school corporations." Id. The plaintiff, who had been employed as a teacher by a township school for long enough to earn "permanent" status prior to the partial repeal, brought suit after her contract was terminated. In holding that the repeal violated the Contract Clause, the Court noted that "it is established that a legislative enactment may contain provisions which, when accepted as the basis of action by individuals, become contracts between them and the State or its subdivisions." Id. at 100, 58 S.Ct. at 446, 82 L.Ed. at 690.
*295 In Faulkenbury, our Supreme Court held that legislation reducing teachers' and other State employees' retirement benefits violated the Contract Clause. As the Court explained, "[a]t the time the plaintiffs' rights to pensions became vested [after they had been employed more than five years], the law provided that they would have disability retirement benefits calculated in a certain way. These were rights that they had earned and that may not be taken from them by legislative action." 345 N.C. at 690, 483 S.E.2d at 427. In so holding, the Court rejected the State's argument that the statute the plaintiffs relied on only announced a policy subject to change by a later legislature. The Court focused instead on the terms of the statute to conclude:
We believe that a better analysis is that at the time the plaintiffs started working for the state or local government, the statutes provided what the plaintiffs' compensation in the way of retirement benefits would be. The plaintiffs accepted these offers when they took the jobs. This created a contract.
Id.
Similarly, in Bailey, our Supreme Court held that legislation capping the tax exemption for public employee retirement benefits violated the Contract Clause. After tracing the "long demonstrated [ ] respect" our State's judiciary has shown "for the sanctity *10 of private and public obligations from subsequent legislative infringement," 348 N.C. at 142, 500 S.E.2d at 61, the Court made clear that "[t]he basis of the contractual relationship determinations in these and related cases is the principle that where a party in entering an obligation relies on the State, he or she obtains vested rights that cannot be diminished by subsequent state action." Id. at 144, 500 S.E.2d at 62. Furthermore, as the Court noted in rejecting the State's argument that the exemption constituted an unconstitutional contracting away of its power of taxation,
[t]he rule is well settled that one who voluntarily proceeds under a statute and claims benefits thereby conferred will not be heard to question its constitutionality in order to avoid its burdens. In this case, the State created the exemption and then proceeded for decades to represent it as a portion of retirement benefits and to reap its contractual benefits. It is clear from the record evidence that the State used these representations as inducement to employment with the State, and employees relied on these representations in consideration of many years' valuable service *296 to and with the State. The State's attempt to find shelter under the North Carolina Constitution must be compelling indeed after such a long history of accepting the benefits of the extension of the exemption in question. We find no such compelling case here.
Id. at 147, 500 S.E.2d at 64 (citation and internal quotation marks omitted). Thus, given that the tax exemption benefit had "helped attract and keep quality public servants in spite of the generally lower wage paid to state and local employees," id. at 150, 500 S.E.2d at 65, the Court concluded that the State's retroactive imposition of a cap on the exemption "is not acceptable in a government guided by notions of fairness, consent and mutual respect between government and man, and certainly not between the government of this State and its employees." Id. at 150, 500 S.E.2d at 66.
More recently, in Wiggs, our Supreme Court again determined that a retroactive change to a statutory employment benefit for public employees violated the Contract Clause. There, the plaintiff was a deputy sheriff who retired early after three decades of service and received a "special separation allowance" pursuant to N.C. Gen.Stat. § 143-166.42 from the county that employed him. He then obtained part-time employment as a police officer with the Raleigh-Durham Airport Authority, which prompted his former county employer to adopt a resolution providing that special separation allowance payments would terminate upon a retiree's re-employment with another local government entity. 361 N.C. at 319, 643 S.E.2d at 905. Drawing on its prior holding in Faulkenbury, the Court recognized that the special separation allowance was an employment benefit that was contractual in nature, and concluded that although the county could have acted within its authority "to pass a resolution which would apply prospectively to those whose rights to the special separation allowance had not yet vested," it could not retroactively apply such a resolution "to [the] plaintiff's vested contractual right" to receive the allowance. Id. at 324, 643 S.E.2d at 908.
Based on the record and our review of the case law made relevant by the actual arguments of the parties, we conclude that the trial court did not err in its determination that career status rights constitute a valuable employment benefit and that by satisfying the requirements of the Career Status Law prior to the Career Status Repeal, Plaintiffs Nixon, Holmes, Beatty, Wallace, and deVille earned vested contractual rights to the valuable employment benefit that career status protections represent. While the benefits at issue here may not be identical to those at issue in Faulkenbury, Bailey , and Wiggs, we conclude that those cases *297 demonstrate our Supreme Court's long-standing recognition that when the General Assembly revokes valuable employment benefits that are obtained in reliance on a statute and that offset the relatively low salaries of public employees, it violates the Contract Clause. In reaching this conclusion, we find highly persuasive the affidavit Plaintiffs submitted from labor economist Rothstein, who observes that "[t]here is a useful parallel between job security that derives from a career *11 status award and the economic value of retirement benefits." As Rothstein explains:
It has long been recognized that the prospect of earning future retirement benefits, including pensions and retiree health coverage, has economic value to workers, even those who are not themselves near retirement age. Workers often choose careers based in part on the retirement benefits that are offered. In the same way, the prospect of earning career protections, and the job security that comes with them, has economic value to teachers, and is an important part of the package of pay and benefits that individuals consider when deciding whether to become teachers.
[ ] There are several aspects of the teacher employment relationship that make career status protections more valuable than they might otherwise be. First, teachers are relatively poorly paid. Nationally, the average teacher earned about $56,643 in 2011-12 per year, only 67% of the salary earned by the average full-time, full-year college-educated worker. In North Carolina, teacher salaries are even lower than this-the average public school teacher's salary in 2011-12 was $46,605, down over 12% in real terms since 1999-2000. The 2013-14 North Carolina salary schedule for a teacher with a bachelor's degree specifies a maximum salary of $53,180 for a teacher with 36 or more years of experience, less than the average teacher's salary nationally, and even teachers with master's degrees do not reach the national average until they have accumulated 35 years of experience.
[ ] Second, teacher salaries are typically backloaded. Entering teacher salaries are very low relative to other occupations, as are those with few years of experience, but the growth rate is typically higher than in non-teaching jobs. In North Carolina, teacher salaries rise by a total of only 2.8% over the first seven years, then grow by 15.8%
*298 over the next four years. Total compensation is even more strongly backloaded than are salaries. Teacher pensions do not vest until ten years (for those hired after 2011), and the pension benefit grows with experience much faster than the base salary. Salary-experience profiles are typically much smoother in the economy at large than is the North Carolina teacher's salary schedule. Backloaded salaries mean that it can be quite costly for an experienced teacher to lose his or her job, as he or she has already borne the cost of teaching through the low-compensation early years but will never be able to amortize this through higher earnings in the later part of the career.
....
Based on Rothstein's analysis, we conclude that career status protections have a financial impact that is strongly analogous to, and in some ways directly implicates, the vested contractual rights to benefits as a form of deferred compensation that were at issue in Faulkenbury, Bailey , and Wiggs. We consequently conclude that our Supreme Court's consistent pattern of refusing to allow the State to renege on its statutory promises, after decades of representing the valuable employment benefits conferred by those statutes as inducements to public employment, supports, and even compels, the result we reach here. See, e.g., Bailey, 348 N.C. at 147, 500 S.E.2d at 64.
In the present case, the record indicates a similar pattern of inducement and reliance, given Plaintiffs' affidavits describing how they relied on the availability of career status protections when they chose to work as teachers in North Carolina's public schools, as well as affidavits from eight public school administrators describing how they have relied on the Career Status Law to attract and retain qualified teachers. Based on this uncontradicted evidence, we cannot escape the conclusion that for the last four decades, the career status protections provided by section 115C-325, the very title of which-"Principal and Teacher Employment Contracts"-purports to govern teachers' employment contracts, have been a fundamental part of the bargain that Plaintiffs and thousands of other teachers across this State accepted when they decided to defer the pursuit of potentially more lucrative professions, as well as the opportunity to work in states that offer better financial compensation to members of their own profession, in order to accept employment in our public *12 schools. We therefore conclude further that, as in Faulkenbury, Bailey , and Wiggs, the State has reaped benefits by using the Career Status Law as an inducement by which to attract and *299 retain public school teachers in spite of the relatively low wages it pays them. Thus, although the dissent cites our Supreme Court's prior observation in Taborn v. Hammonds, 324 N.C. 546, 556, 380 S.E.2d 513, 519 (1989), that the purpose of the Career Status Law was "to provide teachers of proven ability for the children of this State by protecting such teachers from dismissal for political, personal, arbitrary or discriminatory reasons," in support of its conclusion that career status protections were intended merely to advance a policy of providing good teachers "for the children" rather than to provide contractual rights for the teachers, we cannot and will not ignore the thousands of North Carolinians who ended up on the other side of that equation by relying on the inducement of a statutory promise to gain vested rights to valuable employment benefits.
The State's attempt to distinguish the career status protections at issue here from the contractual rights to benefits under the statutory schemes at issue in Brand, Faulkenbury , and Bailey is wholly unpersuasive. Indeed, the State's description of those benefits as being automatically conferred by express statutory guarantees conveniently overlooks striking similarities those statutes share with the Career Status Law. In Brand, for example, the granting of tenure, or "permanent" status, was contingent on the teacher successfully completing at least five years of probationary employment and then entering into a new contract. Although the statute did not expressly require approval by the local school board, we can infer that a public school teacher's contract would only be renewed after review by some governmental body or agent with knowledge of Indiana's Teachers' Tenure Law, and we therefore see no meaningful difference between its operation and the procedures by which Plaintiffs earned career status protections under the Career Status Law. In a similar vein, the statutes at issue in Faulkenbury, Bailey , and Wiggs required employees to remain employed for a minimum vesting period before they were entitled to receive any benefits at all; here again, it stands to reason that those employees' performances were evaluated at regular intervals by supervisors with knowledge of the statutory vesting process for retirement benefits and strong incentives to terminate inadequately performing employees before those benefits vested. Therefore, because the State's purported distinctions make no difference, we conclude that these Plaintiffs who relied on the statutory promise offered by the Career Status Law and satisfied its requirements before the Career Status Repeal earned a vested right to career status protections that is every bit as contractual in nature as the plaintiffs' rights in Brand, Faulkenbury, Bailey , and Wiggs. Indeed, we believe that to hold otherwise would go against nearly two centuries of respect *300 our State's judiciary has shown for the sanctity of private and public contractual obligations and would thus "not [be] acceptable in a government guided by notions of fairness, consent and mutual respect between government and man, and certainly not between the government of this State and its employees." Bailey, 348 N.C. at 150, 500 S.E.2d at 66.
The State's emphasis on Plaintiffs' individual employment contracts with their local school boards is similarly misplaced. First, the State's argument fundamentally misconstrues the basis for Plaintiffs' claims under the Contract Clause. Put simply, Plaintiffs are not suing based on their individual contracts, but instead based on the State's statutory promise, contained in section 115C-325 of our General Statutes, that teachers who satisfied the requirements of the Career Status Law and earned that status would be entitled to its protections, and it is that contractual promise-just like the statutory promises at issue in Brand, Faulkenbury, Bailey , and Wiggs -that Plaintiffs allege was substantially impaired by the Career Status Repeal. Therefore, the boilerplate disclaimers the State relies on from Plaintiffs' individual employment contracts with local school boards-which do not purport to address the revocation of career status protections in any way but instead merely, and sensibly, recognize that a teacher's salary *13 and continued employment depend on the State not running out of the funds necessary to honor its obligations-have no bearing whatsoever on this litigation.
The State also puts heavy emphasis on a similar provision contained in a sample contract from the Durham Public Schools ("DPS") Board of Education, included in the record with the affidavit from DPS Chair Heidi H. Carter, that specifically refers to the contract as being "subject to the provisions of the school law applicable thereto, which are hereby made a part of this contract." The State contends this language evidences a clear reservation of rights that is consistent with the long-held proposition that one legislature cannot bind another, see, e.g., Town of Shelby v. Cleveland Mill & Power Co., 155 N.C. 196, 71 S.E. 218 (1911), and therefore demonstrates that career status protections have always been subject to termination by the General Assembly. But this argument also fails. On the one hand, as noted supra, our Supreme Court has already rejected a similar argument in Faulkenbury. See 345 N.C. at 690, 483 S.E.2d at 427. On the other hand, given the State's intense focus on individual employment contracts, it certainly bears noting that none of these Plaintiffs who had already earned career status worked for DPS, which means that none of them would have been bound by this vague caveat. The State further contends that the sample contract is relevant because Plaintiffs' complaint purported to seek relief on behalf of all *301 teachers and the trial court's order likewise applies to all teachers, but here again, the State's argument is unavailing because it misconstrues the basis for Plaintiffs' claims under the Contract Clause.
(2) The Career Status Repeal substantially impairs contractual obligations
Having determined that Plaintiffs have contractual rights to career status protections, we turn next to the question of whether those rights were substantially impaired. This is not a difficult question. Under the Career Status Law, these Plaintiffs would have continuing contracts; under the Career Status Repeal, their contracts will be limited to a maximum duration of four years. Compare N.C. Gen.Stat. § 115C-325(d)(1), with 2013 N.C. Sess. Law 360 § 9.6(b). Moreover, under the Career Status Law, if these Plaintiffs were terminated, demoted, or otherwise disciplined, they would be entitled to a hearing with full due process rights; under the Career Status Repeal, there is no guarantee of a hearing. Compare N.C. Gen.Stat. § 115C-325(h), (j), with 2013 N.C. Sess. Law 360 § 9.6(b). Thus, in light of the relevant state and federal decisions discussed supra, we have no trouble concluding that the trial court was correct in its determination that the Career Status Repeal substantially impairs Plaintiffs' vested contractual rights.
For its part, the State argues that Plaintiffs' vested contractual rights to career status protections are not substantially impaired by the Career Status Repeal based on a misapplication of the Fourth Circuit's recent decision in Cherry v. Mayor & Balt. City, 762 F.3d 366 (4th Cir.2014). There, the plaintiffs sought to challenge a municipal ordinance that made actuarial adjustments to a pension plan by replacing a variable benefit with a cost-of-living adjustment. Id. at 369. The Fourth Circuit concluded that the city's modification of its pension plan fell within a state-law contract doctrine permitting "reasonable modifications" to pension plans, which would allow the plaintiffs to challenge the reasonableness of the modification by bringing a breach of contract action for damages. Id. at 372-73. Because a city does not commit a Contract Clause violation "merely by breaching one of its contracts," the plaintiffs could not maintain a Contract Clause action in the absence of a showing that the city had somehow foreclosed them from pursuing a breach of contract action for damages. Id. at 371. In the present case, the State suggests that Cherry should control because the Career Status Repeal was merely a contract modification and Plaintiffs have not asserted any breach of contract claims. There are several reasons why this argument lacks merit. First, the State's claim that the Career Status Repeal is merely a "modification" authorized by Plaintiffs' individual *302 employment contracts based on the boilerplate disclaimers discussed supra once again misconstrues the basis for Plaintiffs' claims under the Contract Clause, and consequently fails. Moreover, *14 the State points to no state-law remedy comparable to the "reasonable modification" doctrine in Cherry that would permit Plaintiffs to bring a breach of contract action for damages here. We therefore conclude that Cherry is not even remotely applicable to the present facts.
(3) The Career Status Repeal was not reasonable and necessary to serve an important public purpose
Finally, the State has the burden of establishing that the Career Status Repeal was a reasonable and necessary means of furthering an important public purpose. See Bailey, 348 N.C. at 151, 500 S.E.2d at 66. Our review as to this third factor involves two steps. First, legislation that substantially impairs contractual rights must have "a legitimate public purpose," which essentially means the State must produce evidence that the purported harm it seeks to address actually exists. See, e.g., Energy Reserves Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569, 581 (1983). Second, if the legislation has a legitimate public purpose, we then examine whether the impairment of contractual rights is a "reasonable and necessary" way to further that purpose or whether the State's objective could have been accomplished through a "less drastic modification" because the State "is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." U.S. Trust Co., 431 U.S. at 30-31, 97 S.Ct. at 1521-22, 52 L.Ed.2d at 114-15. While the State is typically granted a degree of deference as to what is reasonable and necessary when legislation impairs purely private contracts, see Energy Reserves Grp., Inc., 459 U.S. at 412-13, 103 S.Ct. at 704-06, 74 L.Ed.2d at 581, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate" where, as here, public contracts are at issue "because the State's self-interest is at stake." U.S. Trust Co., 431 U.S. at 26, 97 S.Ct. at 1519, 52 L.Ed.2d. at 112.
In the present case, the State contends that even if the Career Status Repeal substantially impaired Plaintiffs' contractual rights, such an impairment is reasonable and necessary to serve the important public purpose of improving the educational experience for North Carolina's public school children. Specifically, citing the North Carolina Constitution's guarantee that "[t]he people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right," N.C. Const. art. I, § 15, the State argues that it is imperative for local school boards to be able to dismiss ineffective teachers, and that the Career Status Repeal is therefore crucially important because it gives *303 local school boards more flexibility in managing their pool of teachers and increasing the overall quality of the teachers in the pool. The State also urges this Court to consider the Career Status Repeal as just one plank in a broader raft of reforms aimed at improving public education. However, as demonstrated by our review of the record and the relevant case law, this argument is without merit.
While no one can deny the general proposition that improving North Carolina's public schools is an important public purpose, the State's purported rationale for the Career Status Repeal is flatly contradicted by the terms of the Career Status Law itself and the affidavits both parties submitted in response to Plaintiffs' motion for summary judgment. Before its repeal, the Career Status Law already explicitly permitted school districts to terminate career status teachers for "inadequate performance," which the statute defined as "the failure to perform at a proficient level on any standard of the evaluation instrument" or "otherwise performing in a manner that is below standard." N.C. Gen.Stat. § 115C-325(e)(1), (e)(3). Furthermore, Plaintiffs submitted affidavits from eight North Carolina public school administrators, who each confirmed that the Career Status Law is an asset for attracting and retaining quality teachers to serve in our State's public schools; that the four-year probationary period provides more than adequate time for school districts to evaluate teachers, identify performance issues early, provide constructive feedback for improvement, and make informed decisions that ensure career status is only granted to teachers who have proven their effectiveness; and, *15 most importantly, that the Career Status Law effectively provided school administrators with sufficient tools to discipline and/or dismiss teachers who have already earned career status and thus did not impede their ability to remove such teachers for inadequate performance. By contrast, the State submitted affidavits from experts who believe that granting tenure to teachers creates insurmountable obstacles to dismissing ineffective teachers, and that removing those obstacles will therefore help improve student performance. Yet the only support that the State's affidavits offer for this premise consists of vague and sweeping generalizations about tenure as an abstract concept, rather than specific facts regarding the operation of North Carolina's Career Status Law or its allegedly adverse impact on our public schools. Given this Court's prior recognition that "conclusory statements standing alone cannot withstand a motion for summary judgment," see, e.g., Midulla v. Howard A. Cain Co., 133 N.C.App. 306, 309, 515 S.E.2d 244, 246 (1999), we conclude that the vague and conclusory assertions contained in the State's affidavits are plainly insufficient to meet its burden here. Therefore, in light of the unrebutted affidavits concerning real *304 North Carolina school administrators' actual experiences implementing the Career Status Law, and the statute's explicit inclusion of "inadequate performance" as a ground for dismissal, we conclude that the substantial impairments the Career Status Repeal imposes on Plaintiffs' vested contractual rights for the purported rationale of making it easier to dismiss ineffective teachers serves no public purpose whatsoever.
Moreover, even assuming arguendo that making it easier to dismiss ineffective teachers was an important public purpose, we are not persuaded that the Career Status Repeal was a reasonable and necessary means to advance that purpose. Our Supreme Court's prior decisions make clear what a high bar this represents. For example, Bailey established that in this context, "[l]egislative convenience is not synonymous with reasonableness" when it comes to legislation that impairs the vested rights of public employees to whom the State has made promises in consideration of their years of public service, and that "necessary" basically means "essential." 348 N.C. at 152, 500 S.E.2d at 67 ("Thus, we hold the Act which placed a cap on tax-exempt benefits was not necessary to a legitimate state or public purpose, i.e., it was not 'essential' because 'a less drastic modification' of the State's exemption plan was available.") (citation omitted; italics added). In Faulkenbury , the State argued that lowering the plaintiffs' retirement benefits was reasonable and necessary to ensure the State pension plan's correct operation. 345 N.C. at 694, 483 S.E.2d at 429. In rejecting that argument, the Court explained that "[w]e do not believe that because the pension plan has developed in some ways that were not anticipated when the contract was made, the state or local government is justified in abrogating it. This is not the important public purpose envisioned which justifies the impairment of a contract." Id. In Bailey , the Court went even further when it rejected the State's argument that capping the tax exemption for public employee retirement benefits was "necessary" to comply with a decision by the United States Supreme Court because there were "numerous ways that the State could have achieved this goal without impairing the contractual obligations of [the] plaintiffs." 348 N.C. at 152, 500 S.E.2d at 67.
In the present case, we are compelled by Faulkenbury and Bailey to reach a similar conclusion. On the one hand, if ensuring the correct operation of the State's plan was not a sufficient basis for the Faulkenbury Court to conclude the substantial impairment of contractual rights was necessary and reasonable, then surely here, the State's decision to totally abolish its plan based on vague generalizations supported by no direct evidence whatsoever must also fail. Moreover, just because the Career Status Repeal might be a convenient way to further the General *305 Assembly's broader efforts to reform public education does not make the abrogation of Plaintiffs' vested contractual rights reasonable. Further, the record is replete with evidence of less drastic available alternatives. The legislative history of the Career Status Law demonstrates that its provisions have been amended numerous times over the last *16 four decades, most recently in 2011 to expand the definition of "inadequate performance." See An Act to Modify the Law Relating to Career Status for Public School Teachers, 2011 N.C. Sess. Law 348. If it had been truly necessary to further augment the ability of local school boards to dismiss teachers for performance-related reasons, our General Assembly could have done so through further reforms; indeed, Plaintiffs' affidavit from Rep. Glazier clearly demonstrates that there was a less drastic alternative available here in the form of H.B. 719, which would have "added definitions of teacher performance evaluation standards, teacher performance ratings, and teacher status, thus creating greater consistency in the determination of career status and revocation of career status based on evaluation ratings," an alternative which enjoyed nearly unanimous bipartisan support. We therefore conclude that the trial court did not err in granting partial summary judgment in favor of NCAE and the five teachers who had already earned career status based on its determination that the Career Status Repeal violated the Contract Clause of the United States Constitution.
B. The Career Status Repeal violated the Law of the Land Clause of the N.C. Constitution
The State also argues that the trial court erred in concluding that the Career Status Repeal violated the Law of the Land Clause found in Article I, Section 19 of the North Carolina Constitution as a separate and independent basis for the court's partial grant of summary judgment to Plaintiffs. We disagree.
The Law of the Land Clause provides in relevant part that "[n]o person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. North Carolina's appellate courts have long held that the clause protects against the taking of property by the State without just compensation. See, e.g., Long v. City of Charlotte, 306 N.C. 187, 196, 293 S.E.2d 101, 107-08 (1982) ("We recognize the fundamental right to just compensation as so grounded in natural law and justice that it is part of the fundamental law of this State, and imposes upon a governmental agency taking private property for public use a correlative duty to make just compensation to the owner of the property taken. This principle is *306 considered in North Carolina as an integral part of the 'law of the land' within the meaning of Article I, Section 19 of our State Constitution.") (citations omitted); State ex rel. Utilities Comm'n v. Buck Island, Inc., 162 N.C.App. 568, 580, 592 S.E.2d 244, 252 (2004) ( "Though the clause does not expressly prohibit the taking of private property for public use without just compensation, our Supreme Court has inferred such a provision as a fundamental right integral to the law of the land.") (citation and internal quotation marks omitted). In Bailey, our Supreme Court recognized that because "[t]he privilege of contracting is both a liberty and a property right," 348 N.C. at 154, 500 S.E.2d at 68 (citation omitted), the Law of the Land Clause guarantees that contractual rights, including those created by statute, constitute property rights and are therefore protected against uncompensated takings. Id. ("[I]f the Legislature had vested an individual with the property in question, ... [the Law of the Land Clause] would restrain them from depriving him of such right.") (citation and emphasis omitted).
In the present case, the State contends that, in light of this Court's prior holding in Shipman v. N.C. Private Protective Servs. Bd., 82 N.C.App. 441, 346 S.E.2d 295, appeal dismissed and disc. review denied, 318 N.C. 509, 349 S.E.2d 866 (1986), all that is required for a challenged statute to comport with the Law of the Land Clause is that the statute must serve a legitimate purpose of State government and be rationally related to that purpose. Thus, given its duty imposed by Article I, Section 15 of the North Carolina Constitution to guard and maintain the right of the people to public education, the State argues that the Career Status Repeal is rationally related to the legitimate purpose of improving our children's educational experience by providing tools for local school boards to more easily dismiss underperforming teachers in order to serve the paramount goal of staffing the public *17 schools with the best teachers possible. The State also heavily emphasizes the great deference and strong presumption of constitutionality that North Carolina's appellate courts typically afford to legislation enacted by our General Assembly, see, e.g., Baker v. Martin, 330 N.C. 331, 334, 410 S.E.2d 887, 889 (1991) ("In determining the constitutionality of a statute we are guided by the following principle: [e]very presumption favors the validity of a statute. It will not be declared invalid unless its unconstitutionality be determined beyond reasonable doubt.") (citations, internal quotation marks, and brackets omitted), and implies that by ignoring these presumptions, the trial court violated the doctrine of separation of powers by improperly substituting its views for those of the Legislature. Indeed, while acknowledging that there are differing views on how best to improve public education in North Carolina, the State characterizes the present lawsuit as the sort of partisan policy *307 dispute that is for the people's elected representatives, rather than the courts, to resolve. Furthermore, the State argues that Plaintiffs cannot meet their burden of proving the Career Status Repeal is unconstitutional beyond reasonable doubt because the statutory grounds for termination remain largely the same as under the Career Status Law and because teachers whose contracts are not renewed can still petition the local school board for a hearing.
There are many reasons why this argument fails. First, the State's reliance on the standard of review this Court utilized in Shipman is wholly misplaced. There, we reviewed a challenge to our General Assembly's enactment of legislation to regulate "those professions which charge members of the public a fee for engaging in many activities which overlap the functions of our public police" by, inter alia, requiring that private detectives obtain licenses from a state agency. 82 N.C.App. at 443, 346 S.E.2d at 296. Because we determined that regulating such an occupation is clearly a legitimate purpose of state government, and that licensing is rationally related to that purpose, we rejected the plaintiff private investigator's argument that the statute violated the Law of the Land Clause. Id. at 444-45, 346 S.E.2d at 297. Significantly, however, Shipman did not involve any takings claim by the plaintiff, whose arguments focused exclusively on whether the statute authorizing the Private Protective Service Board to grant, suspend, or revoke licenses violated his right to due process, and we therefore find Shipman inapplicable to the present facts.
Instead, we turn for guidance to the model our Supreme Court established in Bailey. As the Bailey Court made clear, a statutory promise of employment benefits, once vested, confers a contractual right, which is also a property right, the uncompensated impairment of which by subsequent legislation can constitute a taking in violation of the Law of the Land Clause. 348 N.C. at 154-55, 500 S.E.2d at 68-69. Having already determined that the challenged legislation violated the Contract Clause, the Bailey Court had no trouble in concluding that
it is clear that the State has taken [the] plaintiffs' private property by passage of the Act. [The p]laintiffs contracted, as consideration for their employment, that their retirement benefits once vested would be exempt from state taxation. The Act now undertakes to place a cap on the amount available for the exemption, thereby subjecting substantial portions of the retirement benefits to taxation. This is in derogation of [the] plaintiffs' rights established through the retirement benefits contracts and thus *308 constitutes a taking of their private property. The State fails to compensate them for such taking through the Act. As such, the act is unconstitutional under the [Law of the Land Clause].
348 N.C. at 155, 500 S.E.2d at 69. Similarly here, having already determined that the Career Status Repeal substantially impairs Plaintiffs' vested rights to career status protections in violation of the Contract Clause, the only remaining issue for our analysis is whether this derogation of Plaintiffs' rights constitutes an unconstitutional taking of property without just compensation. Consistent with Bailey, we conclude that it does. Here, as in Bailey, Plaintiffs contracted, as consideration for their employment, that after fulfilling the Career Status Law's requirements, they would be entitled to career *18 status protections. Here, as in Bailey, the Career Status Repeal purports to abrogate those protections and thus constitutes a taking of Plaintiffs' private property. Here, as in Bailey, the Career Status Repeal offers no compensation for this taking. Thus, here, as in Bailey, the Career Status Repeal violates the Law of the Land Clause.
The State's argument that Plaintiffs' constitutional rights have not been violated because they retain the same due process protections under the Career Status Repeal fails because it is patently false. While the State may be correct that the statutorily enumerated bases for termination remain largely unchanged, as already discussed supra, under the Career Status Law, a teacher who earned career status and was subsequently dismissed or disciplined was entitled to a hearing, whereas under the Career Status Repeal, there is no entitlement to a hearing. Compare N.C. Gen.Stat. § 115C-325(h)(2), (3), with 2013 N.C. Sess. Law 360 § 9.6-9.7; see also Crump v. Bd. of Educ. of Hickory Admin. School Unit, 326 N.C. 603, 613-14, 392 S.E.2d 579, 584 (1990) (holding that "a career teacher under [ section] 115C-325 ... ha[s] a cognizable property interest in his continued employment," and is "entitled to a hearing according with principles of due process.") The State's argument also ignores the fact that it is not merely the Career Status Law's due process protections that are at issue here, since the Career Status Repeal also deprives Plaintiffs of their vested rights to continuing employment. Furthermore, the Career Status Repeal makes no provision for justly compensating Plaintiffs for the derogation of their rights to vested career status protections. The 25% Provision might have provided some degree of compensation to a small minority of career status teachers, but its own explicit terms would provide nothing to at least 75% of teachers who had already earned career status. See 2013 N.C. Sess. Law 360 *309 § 9.6(g), (h). In any event, the State makes no argument that the trial court erred in permanently enjoining the 25% Provision's implementation and enforcement based on the court's determination that the provision is inextricably tied to the unconstitutional revocation of career status, as well as unconstitutionally vague.
In light of the preceding analysis, we have no trouble concluding that Plaintiffs have met their burden of proving the Career Status Repeal unconstitutional beyond reasonable doubt and thereby have successfully rebutted the strong presumption of constitutionality this Court typically affords to legislation enacted by our General Assembly. Moreover, contrary to the State's argument, our review of the record and relevant case law makes clear that Plaintiffs are seeking vindication of their constitutional rights, rather than attempting to litigate a partisan policy dispute over education. As such, we hold that the trial court did not err in concluding that the Career Status Repeal violated the Law of the Land Clause of the North Carolina Constitution as a separate and independent basis for its partial grant of summary judgment to Plaintiffs.
C. The trial court did not err in declining to strike certain portions of Plaintiffs' affidavits
Additionally, the State argues that the trial court erred in failing to strike certain portions of Plaintiffs' affidavits that it contends were not properly admissible because they were not based on the affiants' personal knowledge. We disagree.
As this Court has previously recognized, because Rule 56(e) of the North Carolina Rules of Civil Procedure provides in relevant part that affidavits supporting and opposing summary judgment "shall be made on personal knowledge," when an affidavit contains statements not based on an affiant's personal knowledge, the trial court "may not consider" those portions of the affidavit. Moore v. Coachmen Indus., Inc., 129 N.C.App. 389, 394, 499 S.E.2d 772, 776 (1998) (citation omitted); see also N.C. Gen.Stat. § 1A-1, Rule 56(e) (2013). In the present case, the State complains that there is no possible way that any of Plaintiffs' affiants could have personal knowledge of what motivates the decisions of every public school teacher in North Carolina. Thus, the State contends that the trial court erred by failing to strike those portions of each of these Plaintiffs' affidavits that included statements *19 about the impact of career status on all teachers in the State, as well as certain portions of the affidavits from school administrators that purported to describe what all teachers in the State "relied upon" or "viewed as important" in making their career decisions. *310 This argument is without merit. On the one hand, we are not convinced that the statements the State contests are beyond the personal knowledge of the affiant teachers and administrators, all of whom are experienced North Carolina educators and are thus sufficiently familiar with the Career Status Law to competently describe its benefits and protections in general terms, as well as the basic economic assumptions that motivate members of their profession. On the other hand, even assuming arguendo that the trial court should have excluded these contested statements, in light of the fact that the State is unable to specifically identify any aspect of the court's order that relied on them, we conclude that any error in its failure to strike them was entirely harmless. Indeed, the only portion of the order that deals with the Career Status Law's impact on teachers' motivations and career decisions was the trial court's finding that
[Plaintiffs] were statutorily promised career status rights in exchange for meeting the requirements of the Career Status Law. When they made their decisions both to accept teaching positions in North Carolina school districts and to remain in those positions, they reasonably relied on the State's statutory promise that career status protections would be available if they fulfilled those requirements. The protections of the Career Status Law are a valuable part of the overall package of compensation and benefits for [P]laintiffs and other teachers, benefits that they bargained for both in accepting employment as teachers in North Carolina school districts and remaining in those positions. From the perspective of school administrators, career status protections help attract and retain teachers despite the low salaries established by State salary schedules.
Our review of the record demonstrates that this finding of fact is well supported by statements in each of the named Plaintiffs' affidavits about how they personally relied on the Career Status Law's statutory promise, and by statements in each of the administrators' affidavits about how they recognized the Career Status Law's benefits based on their own personal experiences.
The premise for the State's argument here appears to be that because these Plaintiffs do not speak for every teacher in North Carolina, the trial court erred by permanently enjoining the State from implementing and enforcing the Career Status Repeal. But here again, the State misconstrues the basis for Plaintiffs' lawsuit. While the State's argument might have some merit if this were a class action, it is totally inapplicable to *311 the present litigation, in which Plaintiffs contend that the Career Status Repeal is unconstitutional as applied to them, given their vested contractual and property rights in the Career Status Law's protections. Despite the State's claims to the contrary, that does not mean that the trial court erred when it concluded that the Career Status Repeal is equally unconstitutional as applied to all similarly situated public school teachers who have already earned career status. Accordingly, we hold that the trial court did not err in granting summary judgment to NCAE and Plaintiffs Nixon, Holmes, Beatty, deVille, and Wallace.
D. The arguments raised by the dissent are neither persuasive nor properly before this Court
Finally, we are compelled to note that "[i]t is not the role of the appellate courts ... to create an appeal for an appellant." Viar v. N.C. Dept. of Transp., 359 N.C. 400, 402, 610 S.E.2d 360, 361, reh'g denied, 359 N.C. 643, 617 S.E.2d 662 (2005) ; see also Hammonds v. Lumbee River Elec. Membership Corp., 178 N.C.App. 1, 13, 631 S.E.2d 1, 9, disc. review denied, 360 N.C. 576, 635 S.E.2d 598 (2006). We find this well-established maxim especially applicable where, as here, the appellant is the State and the litigation before us involves the State's attempts to revoke the statutorily vested contract and property rights of thousands of North Carolinians.
*20 In the present case, as demonstrated supra, the State's appellate brief asks this Court to reverse the trial court's decision based on its arguments that: (1) all acts of our General Assembly are accompanied by a (rebuttable) presumption of constitutionality; (2) the Career Status Repeal did not violate the North Carolina Constitution's Law of the Land Clause because it was enacted for the legitimate government purpose of "fixing" our public schools; and (3) although teachers do have contracts with their local school boards, the Career Status Repeal did not violate the Contract Clause of the United States Constitution because it did not substantially impair those contract rights in light of: (a) conditional language contained in boilerplate disclaimers in Plaintiffs' employment contracts and a sample contract from the DPS Board of Education, (b) purported distinctions between the Career Status Law's vesting mechanism and those of the statutes at issue in Brand, Faulkenbury and Bailey, and (c) the Fourth Circuit's recent decision in Cherry. The State also argues that the trial court erred in failing to strike certain portions of Plaintiffs' affidavits. In its reply brief to Plaintiffs' appellee brief, the State reiterated these arguments. Shortly before this case was orally argued, the State submitted a memorandum of additional authority to call this Court's attention to *312 Article I, Section 15 of the North Carolina Constitution, which obligates the State to guard and maintain its citizens' right to public education, and the United States Supreme Court's decision in Nixon v. Shrink Missouri Gov't PAC et al., 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), which dealt with campaign finance reform. During oral arguments, this Court and both parties properly focused primarily on the issues raised in the State's appellate brief. As discussed supra, these arguments are wholly unpersuasive.
Nevertheless, our learned colleague dissents in part from the majority opinion of this Court based on his view that the trial court erred in concluding that the Career Status Repeal violates the Contract Clause for the reasons articulated in the United States Supreme Court's decision in Brand. Instead, our learned colleague would resolve this case in the State's favor based on that Court's prior holdings in Phelps v. Bd. of Educ., 300 U.S. 319, 57 S.Ct. 483, 81 L.Ed. 674 (1937) and Dodge v. Bd. of Educ., 302 U.S. 74, 58 S.Ct. 98, 82 L.Ed. 57 (1937). As neither of these cases was cited by either of the parties at any point in this litigation, we do not believe it would be appropriate to resolve this case by essentially constructing the State's argument for it, as to do so would violate the rationale behind our Supreme Court's holding in Viar and this Court's subsequent decision in Hammonds by leaving Plaintiffs, as appellees, "without notice of the basis upon which [this Court] might rule." Hammonds, 178 N.C.App. at 13, 631 S.E.2d at 9 (quoting Viar, 359 N.C. at 402, 610 S.E.2d at 361 ). While we recognize that Viar and Hammonds dealt with technical violations of N.C. R.App. P. 10 and 28, we find their rationales equally applicable to the substantive errors of omission committed by the State as the appellant here. Rule 28 of our Rules of Appellate Procedure provides in pertinent part that
[t]he function of all briefs required or permitted by these rules is to define clearly the issues presented to the reviewing court and to present the arguments and authorities upon which the parties rely in support of their respective positions thereon. The scope of review on appeal is limited to issues so presented in the several briefs. Issues not presented and discussed in a party's brief are deemed abandoned.
N.C. R.App. P. 28(a) (emphasis added). Moreover, Rule 28(b) mandates that an appellant's brief shall include, inter alia, "[a]n argument, to contain the contentions of the appellant with respect to each issue presented. Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned." N.C.R.App. P. 28(b)(6). In the present case, we conclude that, if the analysis *313 in our learned colleague's dissent is correct, the State has violated Rule 28 by failing to raise any argument on the issue of whether the outcome of this case should be determined based on Brand or based on Phelps and Dodge. We conclude further that to disregard the arguments the State actually made in order to substitute a potentially stronger *21 argument that Plaintiffs have never been given any opportunity to address would fundamentally violate the substance of our Rules and the spirit of basic fairness they aim to preserve, as well as thrust this Court into the improper position of performing as an advocate for one of the parties to this dispute.
Although our Supreme Court held in Viar that an appeal that fails to comply with Rule 28 is subject to dismissal, see 359 N.C. at 402, 610 S.E.2d at 361, in Hammonds this Court made clear that we do not treat violations of our Rules of Appellate Procedure "as grounds for automatic dismissal" but instead apply appropriate sanctions based on the results of a three-factor test that weighs "(1) the impact of the violations on the appellee, (2) the importance of upholding the integrity of the Rules, and (3) the public policy reasons for reaching the merits in a particular case." 178 N.C.App. at 15, 631 S.E.2d at 10. Here, we conclude that the State's failure as the appellant to raise either Dodge or Phelps as a basis for distinguishing Plaintiffs' and the trial court's reliance on Brand substantially prejudiced Plaintiffs as appellees by denying them sufficient notice of the issues to be contested and the basis upon which this Court might rule. Given the circumstances, we believe that the appropriate sanction here is to apply Rule 28's provision that the issue of whether Dodge and Phelps control the outcome of this case, which was neither presented nor discussed by the State at any point in this litigation, should be deemed abandoned.
In any event, we are also not persuaded by the substantive merits of our learned colleague's dissent. On the one hand, although he attempts to distinguish the Career Status Law from the statute at issue in Brand by emphasizing the Supreme Court's finding that the latter was "couched in terms of contract," 303 U.S. at 105, 58 S.Ct. at 448, 82 L.Ed. at 693, while the former is not, his analysis overlooks, and for reasons discussed supra is significantly undermined by, the fact that the title of section 115C-325 of our General Statutes is "Principal and Teacher Employment Contracts." Furthermore, we are not persuaded by the dissent's efforts to bolster its conclusion that it is within the General Assembly's power to rescind Plaintiffs' vested rights to career status protections based on the Career Status Law's legislative history. Although the Career Status Law has indeed been amended several times since its enactment in 1971, these *314 amendments focused not on the protections it offers-i.e., a career status teacher's right to a continuing contract and a mandatory hearing-but instead on the performance-based reasons that a career status teacher can be dismissed. Thus, while the dissent is correct that these amendments in some ways increased the discretion of local school boards, they did so in ways that did not substantially impair the benefits the Career Status Law provided to teachers who earned vested rights to career status protections, and their implications were far less drastic than the wholesale elimination of those rights represented by the Career Status Repeal.
Moreover, in reaching its holding in Phelps, the United States Supreme Court noted that "where a statute is claimed to create a contractual right we give weight to the construction of the statute by the courts of the state." 300 U.S. at 322, 57 S.Ct. at 485, 81 L.Ed. at 677. Thus, while we are certainly impressed by the breadth of our learned colleague's painstaking research into how courts in other states have addressed this issue, we are equally certain that those cases are beside the point. In the present case, we know of no instance in which our Supreme Court has ever previously answered or even been directly asked the question of whether or not teachers who have already earned the protections of the Career Status Law have obtained vested contractual and property rights that, when violated, implicate the Contract Clause of the United States Constitution or the Law of the Land Clause of the North Carolina Constitution.
We are not persuaded by the dissent's suggestion that we base our decision on our Supreme Court's conclusory assertion in Taborn v. Hammonds, 324 N.C. 546, 380 S.E.2d 513 (1989), that the purpose of the Career Status Law was "to provide teachers of proven ability for the children of this State by protecting such teachers from dismissal for political, personal, arbitrary, or *22 discriminatory reasons." Id. at 556, 380 S.E.2d at 519. In Taborn, the Court addressed the issue of how much process is due when a special education teacher is terminated due to budget cuts necessitating a system-wide workforce reduction, which the then-extant version of the Career Status Law explicitly authorized as one of the reasons a career status teacher could be terminated. The quote the dissent relies on was offered in passing, with scant analytic support apart from a citation to where it originally appeared in the case of Taylor v. Crisp, 286 N.C. 488, 496, 212 S.E.2d 381, 386 (1975), in order to focus the Taborn Court's interpretation of the requirement contained in subsection (e)(1)l that any decrease in the number of teaching positions due to a decrease in funding be "justifiable." 324 N.C. at 556, 380 S.E.2d at 519. Moreover, Taylor addressed a lawsuit by a public school *315 principal whose situation in some ways mirrors that of Plaintiff Link in the present case: when the Career Status Law was originally enacted, he had completed three years of probationary employment as a public school principal, and thus was only a year away from potentially earning career status protections, but his local school board voted against the recommendations of his superintendent and declined to renew his contract for a fourth probationary year. 286 N.C. at 493-94, 212 S.E.2d at 384-85. The plaintiff's challenge centered on whether or not the school board should be bound by the superintendent's recommendation, and that is the context in which the Court opined, without any citation or support, on the purpose of the Career Status Law. Id. at 496, 212 S.E.2d at 386. Because neither Taborn nor Taylor addressed any claims under the Contract Clause, we decline to adopt our learned colleague's conclusion, especially when our Supreme Court, as demonstrated by its holdings in Faulkenbury, Bailey , and Wiggs, has repeatedly held that the State violates the Contract Clause when it attempts to revoke public employees' vested rights to valuable employment benefits provided by statutes that the State has encouraged reliance on as an inducement to public employment.
We also take issue with the dissent's conclusion that even if the Career Status Law does give rise to individual contract rights, the Career Status Repeal does not substantially impair those rights except insofar as it fails to provide for a hearing. We do not believe this conclusion is supported by the record given the affidavits from Plaintiffs, public school administrators, and labor economist Rothstein describing how the Career Status Law's protections provide North Carolina's public school teachers with the valuable employment benefit of job security by providing them with continuing contracts. The dissent insists that although the Career Status Repeal eliminates Plaintiffs' continuing contracts in favor of one-, two-, or four-year terms, their rights have not been substantially impaired because the reasons they can be terminated or non-renewed at the end of each term remain largely unchanged. But this argument totally ignores the obvious fundamental differences between a continuing contract of indefinite duration and a contract that must be renewed every one, two, or four years, as well as the constrictive impact that the latter will have on the opportunities North Carolina's teachers will have to grow and improve by being innovative in the classroom, as well as their abilities to advocate for their students by raising concerns about instructional issues to administrators without fear of losing their jobs. To put this point in another context, consider the differences in the relative levels of job security enjoyed by North Carolina's appellate judges, who must face reelection at the end of each term, and federal *316 judges, who are appointed for life: while reasonable minds may differ over the wisdom of lifetime tenure, no one would dispute that it is a valuable employment benefit and that federal judges therefore enjoy far more job security than their counterparts in our State's elected appellate judiciary. To take this example a step further, imagine what would happen if our General Assembly decided, for whatever reason, to enact legislation purporting to strip all federal judges within our State's borders of their lifetime tenure and force them to stand for reelection periodically just like state judges. A reviewing court would undoubtedly find such a flagrant violation of Article III and basic premises of federalism unconstitutional-and it would also violate *23 the Contract Clause because the revocation of lifetime tenure would substantially impair the affected judges' rights under their employment contracts. This is an imperfect and perhaps absurd example, offered for purely illustrative rather than substantive analytical purposes, but we nevertheless find it broadly analogous to the predicament North Carolina's teachers face regarding the sense of job security they enjoyed prior to the Career Status Repeal by virtue of their vested contractual rights to career status protections. We therefore decline to join the dissent in its conclusion that career status rights are not substantially impaired by a law that explicitly repeals career status rights.
III. Plaintiffs' Appeal
Plaintiffs contend that the trial court erred in denying summary judgment to Plaintiff Link based on its conclusion that, as a probationary teacher who had not yet earned career status, he lacked standing to challenge the Career Status Repeal. The central thrust of Plaintiffs' argument here is that the logic of Brand, Faulkenbury, Bailey , and Wiggs -which the trial court relied on for its determination that teachers who have already earned career status have contractual rights to its protections-should apply with equal force to probationary teachers. Specifically, Plaintiffs argue that all teachers who accepted employment while the Career Status Law was in full effect, and relied upon the availability of career status protections when accepting employment with a school district and remaining employed, gained a contractual right to the continuing availability of those protections upon satisfaction of the requirements of section 115C-325. Thus, Plaintiffs insist that the trial court erred in concluding that under the Career Status Law, probationary teachers do not have contractual rights to career status protections. We disagree.
Our review of the relevant case law demonstrates that Plaintiffs' reliance on Brand, Faulkenbury, Bailey , and Wiggs is misplaced.
*317 While these cases do support Plaintiffs' general argument that statutory promises of benefits that public employees can earn as part of their overall compensation packages by satisfying certain requirements are contractual in nature, they also fatally undermine Plaintiffs' claim that probationary teachers have contractual rights when, by definition, they have not yet satisfied the Career Status Law's requirements. Put simply, Brand, Faulkenbury, Bailey , and Wiggs only dealt with plaintiffs whose contractual rights had already vested before the Legislature changed or repealed the statutes from which those rights arose. Indeed, it was the vesting of those rights that proved determinative in each case.
In Brand, the United States Supreme Court concluded that the plaintiff had a contractual right to "permanent" teacher status because she had already satisfied the statutory requirement of teaching for five years and then entering into a new contract prior to the partial repeal of the Teachers' Tenure Law. 303 U.S. at 104, 58 S.Ct. at 447-48, 82 L.Ed. at 693. Likewise, in Faulkenbury, our Supreme Court's conclusion that the legislation at issue violated the Contract Clause was based on the fact that "[a]t the time the plaintiffs' rights to pensions became vested, the law provided that they would have disability retirement benefits calculated in a certain way. These were rights that they had earned and that may not be taken from them by legislative action." 345 N.C. at 690, 483 S.E.2d at 427 (emphasis added). The Faulkenbury Court further explained that
[w]e believe that when the General Assembly enacted laws which provided for certain benefits to those persons who were to be employed by the state and local governments and who fulfilled certain conditions, this could reasonably be considered by those persons as offers by the state or local government to guarantee the benefits if those persons fulfilled the conditions. When they did so, the contract was formed.
Id. at 691, 483 S.E.2d at 427. Moreover, in assessing whether the plaintiffs in Bailey had contractual rights that were substantially impaired by the General Assembly's enactment of legislation to cap tax exemptions on public employee retirement benefits, the Court provided an extensive analysis of nearly two centuries' worth of state and federal decisions "rooted in the protection of expectational *24 interests upon which individuals have relied through their actions, thus gaining a vested right." 348 N.C. at 145, 500 S.E.2d at 62-63. Ultimately, the Bailey Court held that the legislation at issue violated both the Contract Clause and the Law of the Land Clause because, before the General Assembly enacted it, the plaintiffs had already earned vested contractual rights to receive *318 tax-exempt retirement benefits based on their having satisfied the statutory requirement preconditioning their receipt of those benefits on working for a minimum term of years. Id. at 150, 500 S.E.2d at 66. Perhaps most damning for Plaintiffs' argument here, our Supreme Court's decision in Wiggs clarified that although the government cannot retroactively abrogate an employee's vested contractual right to benefits, it would not violate the Contract Clause "to pass a resolution which would apply prospectively to those whose rights [to benefits] had not yet vested." 361 N.C. at 324, 643 S.E.2d at 908.
In the present case, the Career Status Law preconditions a public school teacher's right to career status protections on working four consecutive years as a probationary teacher and then passing a majority vote by the local school board. N.C. Gen.Stat. § 115C-325(c)(1). Our review of the relevant case law demonstrates that only then can a teacher's contractual right to career status protections be considered vested. As such, we conclude that Brand, Faulkenbury, Bailey , and Wiggs provide no support for Plaintiffs' argument that despite the Career Status Repeal, a probationary teacher has a vested right in the opportunity to earn career status. We are sympathetic to Plaintiff Link's argument that he relied on the availability of career status protections upon satisfaction of the Career Status Law's requirements when he chose to work as a public school teacher in North Carolina instead of accepting a job in another state, and we empathize with the thousands of other similarly situated probationary teachers across this State who no doubt share his skepticism regarding the wisdom of legislation that purports to enhance the educational experience of our State's public school children by essentially yanking the rug out from beneath the feet of those most directly responsible for educating those children in a manner that experienced educators have warned will make it more difficult for North Carolina school districts to attract and retain quality teachers in the future. Nevertheless, this Court may not substitute its views for those of our General Assembly, and we are bound by the aforementioned precedents from our Supreme Court. We therefore hold that the trial court did not err in granting partial summary judgment to the State based on its conclusion that, as a probationary teacher, Plaintiff Link lacked standing to challenge the Career Status Repeal because he had not yet acquired a contractual right to career status protections. Accordingly, the trial court's order is
AFFIRMED.
Judge GEER concurs.
*319 Judge DILLON concurs in part and dissents in part by separate opinion.